# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

_____

|  |  |  |
|---|---|---|
| THOMAS HEYER<br>and ROBERT BOYD,<br>　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>UNITED STATES BUREAU OF PRISONS,<br><br>THOMAS R. KANE, in his official<br>capacity as Acting Director of the United States<br>Bureau of Prisons;<br><br>IKE EICHENLAUB,  in his official<br>capacity as Regional Director of the<br>United States Bureau of Prisons<br>Mid-Atlantic Region;<br><br>and<br><br>SARA M. REVELL, Warden, FCC Butner, and<br>TRACY W. JOHNS, Warden, FCI Butner<br>Medium,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 5:11-cv-318<br><br><br>**COMPLAINT** |

_____

Plaintiffs Thomas Heyer ("Mr. Heyer") and Robert Boyd ("Mr. Boyd") (collectively "Plaintiffs"), by their undersigned counsel, file this complaint against defendants the United States Bureau of Prisons ("BOP"), Thomas R. Kane, Ike Eichenlaub, Sara M. Revell, and Tracy W. Johns (collectively "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.　　　　This lawsuit arises from Defendants' violation of federal law and the United States Constitution by refusing to provide Thomas Heyer and Robert Boyd – two deaf men in

Defendants' custody at the Federal Correctional Institution ("FCI") in Butner, North Carolina – effective communication and auxiliary aids necessary to accommodate their disability. Defendants' illegal and discriminatory conduct has deprived – and continues to deprive – Mr. Heyer and Mr. Boyd of the ability to, *inter alia*, receive adequate and informed medical treatment, participate in institution disciplinary proceedings, effectively take part in any rehabilitative, educational, or religious programs, or communicate with those within and outside the institution. Accordingly, Mr. Heyer and Mr. Boyd seek from the Court the accommodations to which they are legally entitled and which Defendants have refused to provide.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

3.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(e) because Plaintiffs and some or all of the Defendants reside in this district, and a substantial part of the events and omissions giving rise to Mr. Heyer and Mr. Boyd's claims occurred in this district.

## THE PARTIES

**A.      Plaintiffs**

      **1.      Thomas Heyer**

4.      Thomas Heyer has been deaf since birth.

5.      Mr. Heyer's native language is American Sign Language ("ASL"), a complex language that employs signs made with the hands, facial expressions and body language. ASL is a language distinct and different from English—it is not simply English in hand signals. ASL has its own vocabulary and its own rules for grammar and syntax. Mr. Heyer requires a qualified ASL interpreter to communicate effectively with persons who do not know and use ASL.

6.      Mr. Heyer's ability to read lips is limited.  In general, lip reading is a very difficult and unreliable form of communication.  It is extremely difficult to lip-read English because only a small fraction of the sounds used in speaking are clearly visible on the mouth and many sounds appear identical on the lips.  In addition to the difficulties in lip-reading, the ability to accurately lip-read is greatly affected by the speaker's accent, facial bone structure, facial musculature, facial hair, lighting, distance from the lip reader, and other external factors.

7.      In addition, reading and writing cannot be relied upon to provide effective communication with Mr. Heyer.  Mr. Heyer did not complete high school and has an eighth grade education.  As with most persons who become deaf before acquiring language, ASL is Mr. Heyer's native language, and English is a second language for him.  Therefore, Mr. Heyer's English reading and writing skills are much lower than average, and his ability to communicate by reading and writing is profoundly compromised.

**2.      Robert Boyd**

8.      Robert Boyd, a Marine Corps veteran, has been profoundly deaf since 1975, when he lost his hearing as a result of his military service.  Mr. Boyd is unable to understand speech, even with the use of hearing aids.  Mr. Boyd uses hearing aids to help him hear the direction from which a sound is coming.  However, the hearing aids do not work properly unless Mr. Boyd receives new hearing aid batteries when the old batteries weaken or die.

9.      Mr. Boyd communicates by using ASL and requires a qualified ASL interpreter to communicate effectively with persons who do not know and use ASL.

10.     Mr. Boyd's ability to read lips is limited.  And, for the reasons discussed above, lip reading is a difficult and unreliable form of communication.

11.     For these reasons and others, Mr. Boyd does not effectively understand spoken

English.  Instead, Mr. Boyd requires a qualified ASL interpreter to communicate effectively with persons who do not know and use ASL.

12.     Despite Mr. Boyd's profound deafness, a member of Defendants' staff – Mr. Taylor, Mr. Boyd's unit counselor – has repeatedly told Mr. Boyd that he does not believe Mr. Boyd is deaf and has refused him effective communication and auxiliary aids on this ground.

**B.     Defendants**

13.     The BOP is the federal executive agency responsible for the supervision and custody of over 200,000 inmates and detainees, including Plaintiffs.  The BOP is headquartered in Washington, D.C.  FCI Butner, where Plaintiffs are detained, is a correctional complex controlled and operated by the BOP.

14.     Thomas R. Kane ("Acting Director Kane") is the Acting Director of the BOP. Acting Director Kane is responsible for the oversight and management of the BOP's 115 institutions and for the safety and security of the more than 200,000 inmates and detainees under the agency's jurisdiction, including the BOP's policies and practices regarding the treatment of and services provided to disabled inmates and detainees.  Acting Director Kane is aware of the BOP's and FCI Butner's policies and practices regarding disabled individuals and, more specifically, Defendants' failure to provide Plaintiffs with effective communication in FCI Butner's programs and services.  He is sued in his official capacity.

15.     Ike Eichenlaub ("Regional Director Eichenlaub") is the Regional Director of the BOP's Mid-Atlantic Region. He is responsible for the development, approval, implementation, monitoring and evaluation of policies, operations and programs for the federal institutions and correctional complexes in the Mid-Atlantic Region, including FCI Butner.  He is aware of the BOP's and FCI Butner's policies and practices regarding disabled individuals and, more

specifically, Defendants' failure to provide Plaintiffs with effective communication in FCI Butner's programs and services. He is sued in his official capacity.

16.     Sara M. Revell  ("Warden Revell") and  is the warden of Federal Correctional Complex ("FCC") Butner.  Tracy W. Johns ("Warden Johns") is the warden of FCI Butner. Warden Revell and Warden Johns are responsible for the day-to-day operations of the Butner. They are aware of the BOP's and FCI Butner's policies and practices regarding disabled individuals and, more specifically, Defendants' failure to provide Plaintiffs with effective communication in FCI Butner's programs and services.  They are sued in their official capacity.

17.     At all times relevant to this action, Acting Director Kane, Regional Director Eichenlaub, Warden Revell, and Warden Johns, were acting pursuant to their authority as an official, agent, or employee of the United States.

## STATEMENT OF FACTS

### A.     Plaintiffs' Civil Detention

18.     Although they are being held in FCI Butner, Plaintiffs are not prisoners.  Mr. Heyer and Mr. Boyd both have been previously convicted of federal crimes, but they have served their complete sentences.  They are detained pending a hearing under the Adam Walsh Child Protection and Safety Act of 2006.  *See* 18 U.S.C. § 4248.  Once the government has initiated the civil commitment process, the release of the individual is stayed pending a mandatory hearing to determine whether the person is sexually dangerous.  *Id*.

19.     Mr. Heyer and Mr. Boyd, as certified individuals, have been in the custody of BOP at FCI Butner since 2008, awaiting their mandatory civil commitment hearing under § 4248, the dates of which have not been determined.  All § 4248 cases pending in the Eastern

District of North Carolina were stayed from July 3, 2008 until June 14, 2010 pending the determination of the constitutionality of § 4248.

20.     To date, and as described below, Defendants have denied Mr. Heyer and Mr. Boyd *all* forms of effective communication.  This deprivation of Plaintiffs' rights would only be compounded if Plaintiffs' detention continues following a hearing.  In that circumstance – if not remedied by the Court – Plaintiffs would be deprived of the means of effectively communicating with the very individuals who are determining whether Plaintiffs' detention must continue.

**B.     Medical Treatment and Rehabilitation**

21.     Mr. Heyer and Mr. Boyd both entered FCI Butner in the spring of 2008 and were placed in the "Maryland Unit" of the facility, along with about 90 other detainees awaiting a civil commitment hearing under 18 U.S.C. § 4248.

22.     Detainees are encouraged to periodically attend Multidisciplinary Treatment Team ("MTT") meetings to discuss available programs and rehabilitation progress.  Defendants have refused to provide Mr. Heyer or Mr. Boyd with a qualified ASL interpreter during these meetings.  For example, at a September 21, 2010, meeting with his MTT, Mr. Heyer left the meeting after no interpreter was provided because he could not effectively participate.  However, Butner staff have communicated to other detainees that Mr. Heyer's non-attendance may be held against him at subsequent proceedings.

23.     Mr. Boyd receives frequent medical treatment at FCI Butner for certain dermatological conditions, and Defendants have not provided a qualified ASL interpreter to accompany him during these medical appointments.  Forced to rely on lip-reading, Mr. Boyd's medical appointments are further hindered due to his inability to engage in even limited communication with non-native English-speaking doctors, whose accents compound the inherent

difficulties of lip-reading.

24.     Mr. Heyer also receives medical treatment at FCI Butner for his high blood pressure and high cholesterol, and Defendants have not provided a qualified ASL interpreter to accompany him during these medical appointments.  In addition, because he is not provided an interpreter at these appointments, Mr. Heyer does not know when and how often he must refill his prescription medications.  For example, during a recent medical appointment on February 8, 2011, the doctor reprimanded Mr. Heyer for failing to get refills for his blood pressure medication, but Mr. Heyer did not understand the doctor's previous instructions for taking the medications because he was not provided with an interpreter at that prior visit.  Mr. Heyer therefore went without critical medications due to the failure of Defendants to provide him with effective communication at his medical appointments.  In addition, doctors at Butner have altered Mr. Heyer's medication dosages on occasion, without the benefit of actually communicating with their patient.

25.     Under the foregoing circumstances, Mr. Heyer and Mr. Boyd are unable to understand their medical treatment or provide informed consent to medical treatments and procedures.

26.     Mr. Heyer and Mr. Boyd also receive dental treatment at FCI Butner, but they are not provided with a qualified ASL interpreter to accompany them during these dental appointments.  For example, Mr. Boyd last visited the dentist the week of February 7, 2011, to address a tooth infection and extraction.  He was not provided with an interpreter at this visit, and no one accompanied him to the appointment.  Similarly, Mr. Heyer recently went to the dentist for treatment for a broken tooth, but was provided no interpreter and did not understand anything the dentist was saying to him.  In addition to the normal difficulties surrounding lip-

reading, Mr. Heyer and Mr. Boyd were both completely unable to read the dentist's lips due to the strong examination light and the fact that the dentist wore a mask. Again, neither Mr. Heyer nor Mr. Boyd could effectively understand their dental treatment or consent to dental procedures under these circumstances.

27. Additionally, Mr. Boyd has requested a qualified ASL interpreter to accompany him during his ophthalmology appointments, and Defendants have refused to provide one.

28. Occasionally, another detainee, who has extremely limited ASL abilities, has been assigned to accompany Mr. Heyer and Mr. Boyd to their medical appointments and to serve as a de facto interpreter. A lay interpreter with limited skills does not enable effective communication between Plaintiffs and medical personnel. Further, Plaintiffs object to disclosure of their private medical information to a fellow detainee, who is under no obligation to keep confidential any information communicated during Plaintiffs' medical appointments.

**2.     Disciplinary Proceedings**

29. Plaintiffs were not provided an interpreter for the registration and orientation programs upon their arrival in FCI Butner, nor are they provided an interpreter for periodic "Town Hall Meetings," which cover rules and other matters. As a result, Plaintiffs have had and continue to have difficulty understanding the rules and regulations of FCI Butner.

30. As a result of this lack of knowledge about the facility rules and regulations, Mr. Heyer and Mr. Boyd have been subject to disciplinary proceedings and called before the Unit Disciplinary Committee ("UDC") on several separate occasions for alleged violations of the facility's rules and regulations. However, despite specific requests from both Mr. Heyer and Mr. Boyd, neither have been provided with a qualified ASL interpreter at these proceedings. The proceedings are before the unit counselor, Mr. Taylor, and the case manager, Ms. Weaver. Mr.

Taylor has even informed Mr. Boyd on several occasions that he does not believe Mr. Boyd is deaf.

31. As a result of these disciplinary proceedings, certain of Plaintiffs' privileges, including telephone and commissary privileges, have been taken away for periods of time ranging from two to six months.

**3. Communication With Those Outside FCI Butner**

32. Plaintiffs would like to communicate with people outside of FCI Butner, such as their attorneys, family, and friends, but their access to appropriate telecommunications devices is repeatedly restricted or denied.

33. Plaintiffs cannot use a telephone in the same way as a hearing person. Instead, they require a TTY, a videophone, or a CapTel phone.

    a. A TDD or TTY (hereinafter "TTY") allows people to send written messages back and forth to each other by telephone. When both users have TTYs, they can communicate directly over telephone lines. When one person does not have a TTY, a Telecommunications Relay Service ("TRS") operator reads aloud the written messages from the TTY user and transcribes the non-TTY user's verbal response. TRS services are toll free. Though a TTY is a helpful communication tool, it ultimately relies on the user's ability to communicate in written English and, in all events, is a much more time-intensive communication tool than the telephone. The TTY is 60-year-old technology, and has been for the most part supplanted by the videophone. Most deaf individuals no longer have TTYs, and communicate on telephone solely by videophone.

    b. A videophone is a telephone with a camera and screen for visual, realtime communication. Thus, a videophone is a far more effective auxiliary aid for deaf individuals like Plaintiffs who use ASL as a primary means of communication, both because it depends upon ASL skills instead of written skills for communication, and because without a videophone there is no way to contact most deaf individuals outside the institution who no longer own TTYs. Like the TRS system, there is now a Video Relay Service ("VRS"), so that communication can be accomplished by videophone between an ASL user and a hearing, non-ASL user through a relay operator who is a qualified ASL interpreter. However, under the current system one cannot place a call from a TTY to a videophone through any relay service.

c. A CapTel phone is an inexpensive device that allows the user to call another party and speak verbally, while the answering party responses are transcribed and displayed through a captioning service. The CapTel thus permits deaf individuals like Mr. Boyd to use their voice to send messages, while using their eyes to read the written English responses.

34. The Maryland Unit has only one TTY device, and does not have any videophones or CapTel phones. The single TTY device is located in the office of the unit counselor, Mr. Taylor, and therefore can be accessed only by asking Mr. Taylor or the case manger, Ms. Weaver, to unlock the office. Then, either Mr. Taylor or Ms. Weaver must dial the number of the person to whom Plaintiffs wish to communicate. If Mr. Taylor or Ms. Weaver have left the office or are otherwise unavailable, Plaintiffs have no way of accessing the TTY device.

35. Moreover, Plaintiffs are not permitted to make direct TTY to TTY calls on the Maryland Unit TTY. All TTY calls must be made to a Telecommunications Relay System, which is designed to relay TTY calls to hearing persons. Therefore Plaintiffs are completely unable to place calls to other deaf persons outside the institution, even if these persons still had TTYs.

36. Plaintiffs' access to the lone TTY device in the Maryland Unit is regularly restricted or denied, and their access to the TTY device does not provide them an equal opportunity to access telephones as is provided to other detainees. Other detainees are permitted up to 300 minutes of phone time per month, while Mr. Heyer and Mr. Boyd are given access to the TTY phone for significantly shorter periods of time. While other detainees are permitted to use the telephone for calls from 6:00 a.m. until 11:30 p.m., seven days a week, Plaintiffs are restricted to using the TTY device on weekdays from 7:30 a.m. until 3:30 p.m. Finally, while other detainees need not ask permission to use the phone and can use the phone several times a day, Plaintiffs must ask Mr. Taylor or Ms. Weaver to unlock the office in order to use the TTY,

and those individuals consistently deny them access altogether without justification.

37.     Mr. Heyer is especially restricted in his ability to communicate with friends and family outside the institution.  Writing letters is not an effective means of communication for him, and TTY communication poses similar problems for him, due to his lack of English language competency.

38.     In addition, Mr. Heyer has deaf friends whom he is unable to telephone due to the fact that they do not own TTYs, and instead use videophones.  Because Mr. Heyer does not have access to a videophone, he is unable to stay in communication with his deaf friends outside the institution and the deaf community in general.

39.     Regular access to a videophone with relay technology, and a CapTel for Mr. Boyd, would allow Plaintiffs to remain in contact with their family, friends, and attorneys outside of FCI Butner.

**4.     Other Necessary Accommodations Denied**

40.     The facilities at FCI Butner, including Plaintiffs' rooms, lack visual alarms, pagers, or message boards that would alert Plaintiffs to an emergency, such as a fire or lockdown.

41.     Plaintiffs are not alerted to announcements made over the public address speaker system, such as meal announcements, count calls, or meetings.  A pager and message board where announcements are posted would allow them to receive these messages.

42.     Mr. Boyd's hearing aid batteries, though used properly, often significantly weaken and become unusable after a period of days or even hours.  Despite Mr. Boyd's requests, Defendants have not provided well-operating hearing aid batteries to him on an as-needed basis. Mr. Boyd is often provided with old and corroded hearing aid batteries that only last a few

minutes.  As a result, Mr. Boyd's hearing aids are often useless for long periods of time or have been damaged because of the corrosive batteries provided.

43.    Plaintiffs would like to attend religious services offered at FCI Butner.  Mr. Boyd consistently attended religious services at prior corrections institutions where a volunteer interpreter was consistently provided.  However, no interpreter is provided for the services at FCI Butner, making it impossible for Plaintiffs to effectively participate in those services.

44.    Mr. Heyer attends a GED preparation course offered at FCI Butner, but because of Defendants' failure to provide him with an interpreter at the class, his participation is limited because he cannot ask the course assistant any questions and cannot hear when the time limits for sample examinations are finished.

45.    The four televisions in the common area of the Maryland Unit are capable of displaying closed captioning, but Plaintiffs are harassed or physically threatened by other detainees when the closed captioning is activated.  Staff members have refused to activate the closed captioning or provide a television where the closed captioning is consistently activated, despite frequent requests and grievances from the Plaintiffs.  Staff members are also aware of the physical threats and harassment experienced by Plaintiffs when trying to activate the closed captioning, but make no efforts to prevent this activity or to restrain the other detainees from harassing or threatening Plaintiffs.

46.    Plaintiffs are unable to access goods sold in the commissary because they are handed through a mirrored window, and they cannot interact with the person behind the mirrored window in any fashion.

## CLAIMS FOR RELIEF

### COUNT I: DISCRIMINATION ON THE BASIS OF A DISABILITY IN VIOLATION OF THE REHABILITATION ACT AGAINST ALL DEFENDANTS (29 U.S.C. §§ 794 ET SEQ. AND 5 U.S.C. § 703)

47.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

48.     The Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.* (hereinafter "Rehabilitation Act"), provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

49.     Plaintiffs are deaf and, as such, are qualified individuals with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(20).

50.     Plaintiffs are otherwise qualified to receive informed medical treatments offered to other inmates and detainees at FCI Butner, and eligible to participate in commensurate educational, religious, rehabilitation, vocational, and all other programs provided to others at that facility.

51.     The BOP is an executive agency within the meaning of 29 U.S.C. § 794(a).

52.     The operations of the BOP, including the departments, agencies, programs and instrumentalities at FCI Butner such as Health Services, Psychology Services, Sex Offender Management and Treatment, Drug Abuse Treatment, the Education Department and its associated programs, Vocational and Occupational Training programs, Inmate Skills Development Initiative, and work programs such as Federal Prison Industries, are "program[s] or

activit[ies] conducted by an Executive Agency" within the meaning of 29 U.S.C.

§§ 794(b)(1)(A)-(B) and/or (b)(2)(B).

53.     At all times relevant to this action, the Rehabilitation Act was in full force and
effect in the United States, and Plaintiffs had and have a right not to be subjected to
discrimination on the basis of their disability by Defendants.  29 U.S.C. § 794(a).

54.     The purpose of the Rehabilitation Act is to ensure that no "qualified individual
with a disability . . . shall, solely by reason of [] disability, be excluded the participation in, be
denied the benefits of, or be subjected to discrimination under any program or activity receiving
Federal financial assistance or under any program or activity conducted by any Executive agency
. . . ." 29 U.S.C. § 794(a).

55.     The Department of Justice's regulations implementing the Rehabilitation Act
clarify that the BOP and all its activities are "program[s] or activit[ies] conducted by an
Executive Agency" of the United States government, and that "the agency shall furnish
appropriate auxiliary aids where necessary to afford a handicapped person an equal opportunity
to participate in, and enjoy the benefits of, a program or activity conducted by the agency."  28
C.F.R. § 39.160(a)(1).  The Department of Justice's regulations implementing the Rehabilitation
Act additionally mandate that "[i]n determining what type of auxiliary aid is necessary, the
agency shall give primary consideration to the requests of the handicapped person."  28 C.F.R.
§ 39.160(a)(1)(i) (emphasis added).

56.     Auxiliary aids include, but are not limited to, interpreters and telecommunication
devices for deaf persons.  28 C.F.R. § 39.103.

57.     Defendants have discriminatorily impaired and continue to discriminatorily
impair Plaintiffs' ability to communicate effectively with medical staff and healthcare providers,

including physicians; educational and vocational instructors and their fellow students; work program managers and coordinators and their fellow employees; correctional officers; and other members of the institution staff. Furthermore, Defendants have excluded and continue to exclude Plaintiffs from religious, educational, and vocational programs, telephone services, access to functioning hearing aid batteries, television access with closed-captioning, and institution-wide alarms and announcements. Defendants have done this by failing to provide appropriate auxiliary aids to Plaintiffs in violation of the Rehabilitation Act.

58. Defendants' failure to provide to Plaintiffs appropriate auxiliary aids and services to ensure effective communication has denied and continues to deny Plaintiffs, on the basis of their deafness, the same access to Defendants' services, benefits, activities, programs and privileges as is afforded to hearing individuals.

59. The failure to provide appropriate auxiliary aids and services to ensure effective communication, and the failure to provide comparable access to services, benefits, activities, programs and privileges are policies, regular practices and/or customs of Defendants. These failures are ongoing and continue to this date.

60. Defendants have continually failed to provide Plaintiffs with a qualified ASL interpreter and other reasonable auxiliary aids for their deafness resulting in Plaintiffs being:

- unable to communicate effectively with healthcare providers, raise medical issues, understand the treatments and medications they prescribe, or discuss mental health problems;

- excluded from participating in the same religious, educational, vocational, and rehabilitation classes and work programs as hearing detainees;

- deprived of knowledge of institution-wide safety or emergency announcements; deprived of knowledge of institution counts, meals and other important daily activities;

- unable to communicate effectively with correctional officers and staff members;

- subject to disciplinary action stemming from Defendants' refusal to accommodate their deafness;

- deprived of meaningful participation in disciplinary proceedings;
- prevented from obtaining consistent access to new hearing aid batteries;
- harassed by other detainees for attempting to activate closed-captioning on the television in their unit; and
- prevented from contacting family, friends, and their counsel.

61.     As a proximate result of Defendants' violations of the Rehabilitation Act, Plaintiffs have suffered, and continue to suffer, discrimination, unequal treatment, exclusion (including exclusion from Defendants' services, benefits, activities, programs and privileges), financial loss, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, unnecessary loss of rights and privileges, including unnecessary disciplinary measures, and serious injury to their health and mental health, including the injuries specified herein.

62.     Defendants' failure to comply with the Rehabilitation Act has resulted in harm to Plaintiffs, and Defendants are liable to Plaintiffs for harms suffered.  Defendants' failure to comply with the Rehabilitation Act will continue to result in harm to Plaintiffs, as Plaintiffs will be in the custody or supervision of the BOP and will continue to seek to use the services, benefits, activities, programs and privileges provided by Defendants and to which they are entitled.  This harm will continue unless and until Defendants are ordered by this Court to modify their policies, practices and procedures as demanded by the Rehabilitation Act.

### COUNT II: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES DUE PROCESS AGAINST ALL DEFENDANTS (FIFTH AMENDMENT – RIGHT TO QUALIFIED INTERPRETER AT DISCIPLINARY HEARINGS)

63.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

64.     Under the Fifth Amendment of the Constitution of the United States, "[n]o person

. . . shall . . . be deprived of life, liberty, or property, without due process of law."

65.     The Fifth Amendment guarantees Plaintiffs notice and a meaningful opportunity to be heard in connection with institution disciplinary proceedings.

66.     In addition to failing to adequately inform Plaintiffs of the rules applicable in the Maryland Unit, Defendants have repeatedly refused to provide Plaintiffs qualified sign language interpreters for disciplinary hearings stemming from Plaintiffs' alleged violation of those rules, and imposed various punishments on Plaintiffs when it has been determined that such rules were violated. Defendants' refusal to provide qualified interpreters at these hearings has deprived Plaintiffs of notice and a meaningful opportunity to be heard in connection with their disciplinary proceedings.

67.     Defendants' failure to comply with the Fifth Amendment has resulted and will continue to result in harm to Plaintiffs, unless and until they are ordered by this Court to modify their policies, practices and procedures.

### COUNT III: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES – DUE PROCESS AGAINST ALL DEFENDANTS (FIFTH AMENDMENT – INFORMED CONSENT TO MEDICAL TREATMENT)

68.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

69.     Under the Fifth Amendment of the Constitution of the United States, "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law."

70.     The Fifth Amendment guarantees the right to be free from unwanted medical treatment, including the right to be treated only with one's informed consent.

71.     Defendants have systematically denied Plaintiffs the means of effective communication, including the services of a qualified ASL interpreter, which are necessary to allow Plaintiffs to understand and communicate with medical staff and healthcare providers,

including mental health professionals and pharmacists. Without these auxiliary aids, Plaintiffs were and are unable to understand, and thus give their informed consent to, any and all medical treatment to which they have been subjected by Defendants and their employees.

72. Defendants' failure to comply with the Fifth Amendment has resulted in harm to Plaintiff and will continue to do so, as Plaintiffs will remain in the custody of the BOP and will continue to be subjected to these conditions unless and until Defendants are ordered by this Court to modify their policies, practices and procedures pursuant to the Fifth Amendment.

### COUNT IV: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES – DUE PROCESS AGAINST ALL DEFENDANTS (FIFTH AMENDMENT – RIGHT TO PRIVACY IN MEDICAL TREATMENT)

73. Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

74. Under the Fifth Amendment of the Constitution of the United States, "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law."

75. The Fifth Amendment guarantees Plaintiffs a constitutional right to privacy in medical treatment.

76. Defendants' use of other inmates or detainees to interpret for Plaintiffs during medical and mental health appointments violates Plaintiffs' constitutional right to privacy in medical treatment. Such inmate or detainee interpreters have no obligation to keep confidential any information communicated during Plaintiffs' medical or mental health appointments. Moreover, this breach of Plaintiffs' privacy rights is especially problematic in the institution setting where an inmate or detainee's possession of confidential information about another inmate or detainee can be used in threatening and dangerous ways.

77. Defendants' failure to comply with the Fifth Amendment has resulted in harm to Plaintiff and will continue to do so, as Plaintiffs will remain in the custody of the BOP and will

continue to be subjected to these conditions unless and until Defendants are ordered by this Court to modify their policies, practices and procedures pursuant to the Fifth Amendment.

## COUNT V: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES – DUE PROCESS AGAINST ALL DEFENDANTS (FIFTH AMENDMENT – RIGHT TO ADEQUATE MEDICAL TREATMENT)

78.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

79.     Under the Fifth Amendment of the Constitution of the United States, "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law."

80.     The Fifth Amendment guarantees Plaintiffs a right to reasonably adequate medical care and treatment, including the right to any necessary assistive devices for Plaintiffs' disabilities.

81.     Defendants have failed to provide Mr. Boyd with batteries for his hearing aids that are necessary to help Mr. Boyd hear the direction of certain sounds, thereby violating Mr. Boyd's right to adequate medical care and assistive devices necessary for his disability.

82.     Defendants' failure to comply with the Fifth Amendment has resulted in harm to Plaintiff and will continue to do so, as Plaintiffs will remain in the custody of the BOP and will continue to be subjected to these conditions unless and until Defendants are ordered by this Court to modify their policies, practices and procedures pursuant to the Fifth Amendment.

## COUNT VI: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES DUE PROCESS AGAINST ALL DEFENDANTS (FIFTH AMENDMENT – RIGHT TO A REASONABLY SAFE ENVIRONMENT)

83.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

84.     Under the Fifth Amendment of the Constitution of the United States, "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law."

85.    The Fifth Amendment guarantees Plaintiffs a right to a reasonably safe living environment.

86.    Defendants have failed to provide adequate visual alarms, pagers, or message boards that would alert Plaintiffs to an emergency, such as a fire or lockdown, thereby violating Plaintiffs' right to a reasonably safe living environment.

87.    Defendants' failure to comply with the Fifth Amendment poses an unreasonable risk of future harm to Plaintiffs' and will continue to do so, as Plaintiffs will remain in the custody of the BOP and will continue to be subjected to these conditions unless and until Defendants are ordered by this Court to modify their policies, practices and procedures pursuant to the Fifth Amendment.

### COUNT VII: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES FREEDOM OF SPEECH AGAINST ALL DEFENDANTS (FIRST AMENDMENT)

88.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

89.    Defendants have further impermissibly deprived, and continue to deprive, Plaintiffs of their First Amendment rights of freedom of speech by failing to provide them with telecommunication equipment necessary for them to communicate with family and friends outside of FCI Butner.

90.    Hearing inmates and detainees at FCI Butner have telecommunication equipment that allows communication with people outside of FCI Butner.

91.    Defendants' refusal to provide Plaintiffs with telecommunication equipment to ensure the same level of access as hearing detainees serves no legitimate or compelling need and is not rationally related or narrowly tailored to any identified penological or rehabilitative need.

92. Because Plaintiffs are housed in a remote area far from their families and friends, and do not communicate effectively in written or spoken English, written correspondence and personal visits are not adequate alternatives for exercising their First Amendment right to communicate with friends and family.

93. Provision of appropriate telecommunication equipment to Plaintiffs would have negligible effects, if any, on other inmates, detainees, and prison employees at FCI Butner.

94. Defendants' failure to comply with the First Amendment of the United States Constitution has resulted and will continue to result in harm to Plaintiffs, unless and until they are ordered by this Court to modify their policies, practices and procedures.

**COUNT VIII: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT AGAINST ALL DEFENDANTS (42 U.S.C. §§ 2000bb ET SEQ.)**

95. Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

96. Governments may not impose substantial burdens on the religious exercises of institutionalized persons even if the burden results from a rule of general applicability. 42 U.S.C. § 2000bb-1(a).

97. As a branch, department, agency, or instrumentality of the United States, BOP is a government within the meaning of the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. § 2000bb-2(1).

98. The claims under RFRA are brought against the BOP and Kane, Eichenlaub, Revell, Johns, and Stephens in their official capacities as BOP officials.

99. Defendants have impermissibly deprived, and continue to deprive, Plaintiffs of their right to the free exercise of religion, as secured by RFRA, by unlawfully imposing a substantial burden on Plaintiffs' religious exercise. They have done this by failing to provide

interpreters or other means for enabling Plaintiffs to effectively participate in weekly worship services.

100. Hearing inmates and detainees at FCI Butner are able to attend and participate effectively in religious services.

101. Defendants' failure to provide Plaintiffs with an interpreter to ensure the same level of participation as hearing detainees is not in furtherance of any compelling governmental interest.

102. Defendants' failure to comply with RFRA has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs will continue to be in the BOP's custody and will continue to attempt to participate in weekly worship services unless and until Defendants are ordered by this Court to make modifications to BOP policies, practices, and procedures pursuant to RFRA.

## COUNT IX: VIOLATION OF THE CONSTITUTION OF THE UNITED STATES FREE EXERCISE OF RELIGION AGAINST ALL DEFENDANTS (FIRST AMENDMENT)

103. Under the First Amendment of the United States Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise therof." U.S. Const. amend. I.

104. Defendants have impermissibly deprived, and continue to deprive, Plaintiffs of their First Amendment rights of free exercise of religion by discriminating against Plaintiffs because of their mode of speech and by substantially burdening religious exercise.

105. Hearing inmates and detainees at FCI Butner are able to attend and participate effectively in religious services.

106. Defendants have failed provide Plaintiffs with an interpreter necessary for them to

effectively participate in any religious services offered at FCI Butner.

107.     The assistance of an interpreter at normal religious services would provide an adequate means for exercising their First Amendment right to exercise their religion.

108.     Defendants' failure to comply with the First Amendment of the United States Constitution has resulted and will continue to result in harm to Plaintiffs, unless and until they are ordered by this Court to modify their policies, practices and procedures.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request:

A.     The Court adjudge and decree that Defendants, by the organizations, systems, policies, practices and conditions described above, have violated and continue to violate Section 794 of the Rehabilitation Act, the Religious Freedom Restoration Act, and the Constitution of the United States;

B.     The Court enter such injunctive and/or declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure against Defendants and in favor of Plaintiffs as it deems appropriate to remedy past violations of the laws of the United States and to prevent future violations of the same, including by ordering Defendants to provide:

- qualified ASL interpreters to enable Plaintiffs to communicate effectively with medical and mental healthcare professionals, institution staff, educational and vocational instructors, religious leaders, work program managers and coordinators, and disciplinary officers;
- non-aural notification of emergencies or other important events and announcements, *e.g.*, a vibrating pager, visual alarms and/or message boards;
- equal and full access to appropriate and effective telecommunication devices for the deaf, such as full and equal access to a videophone, TTY, and CapTel devices;
- fully functioning hearing aid batteries; and
- consistent and harassment-free access to a television enabled with closed-captioning, commensurate with the television privileges afforded other detainees.

C.    In the alternative, the Court enter such injunctive relief against Defendants to effectuate a transfer of Plaintiffs to an appropriate facility with the proven ability to accommodate deaf detainees such as Plaintiffs;

D.    Judgment be entered against Defendants in favor of Plaintiffs for the costs of litigation, including reasonable attorneys' fees under 28 U.S.C. § 2412(d)(1)(A).

E.    The Court retain jurisdiction of this matter until Defendants demonstrate that they have fully complied with the orders of this Court, and that there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

F.    The Court award Plaintiffs any further relief that the Court deems appropriate.

Dated:  June 20, 2011

Respectfully Submitted,

/s/ Neil A. Riemann
Neil A. Riemann (NC Bar No. 19258)
PENRY RIEMANN PLLC
510 Glenwood Ave., Suite 319
Raleigh, NC  27603
(919) 833-9449 (telephone)
(919) 833-9448 (facsimile)
neil.riemann@penryriemann.com

-- and --

/s/ Philip Fornaci
Philip Fornaci
E. Elaine Gardner
Deborah Golden
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
11 Dupont Circle, N.W. Suite 400
Washington, D.C. 20036
T: 202-319-1000
F: 202-319-1010
philip_fornaci@washlaw.org
elaine_gardner@washlaw.org
deborah_golden@washlaw.org

-- and --

/s/ Ian S. Hoffman
Ian S. Hoffman
Carolyn A. Pearce
David B. Bergman
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
T:  202-942-5000
F:  202-942-5999
ian.hoffman@aporter.com
carolyn.pearce@aporter.com
david.bergman@aporter.com

*Counsel for Plaintiffs Robert Boyd and Thomas Heyer*