```
                                                              1
 1              UNITED STATES DISTRICT COURT
 2           EASTERN DISTRICT OF NORTH CAROLINA
 3                    WESTERN DIVISION
 4    - - - - - - - - - - - - - - - - x
 5    THOMAS HEYER and ROBERT BOYD,    :
 6              Plaintiffs,            :
 7         v.                          : Civil Action No.
 8    UNITED STATES BUREAU OF          : 5:11-CT-3118-D
 9    PRISONS, et al.,                 :
10              Defendants.            :
11    - - - - - - - - - - - - - - - - x
12          SENSITIVE - SUBJECT TO PROTECTIVE ORDER
13            Deposition of U.S. BUREAU OF PRISONS,
14       By and through its Designated Representative,
15                    TODD RODRICK CRAIG
16                     Washington, DC
17                 Thursday, January 9, 2014
18                       9:39 a.m.
19
20    Job No.: 49884
21    Pages: 1 - 303
22    Reported by: Lee Bursten, RMR, CRR
```

1  MR. HOFFMAN: Okay. If we could go off the
2  record for just a moment.
3      (Discussion off the record.)
4  BY MR. HOFFMAN:
5      Q    Mr. Craig, before we took the last break,
6  we were speaking about Plaintiffs' Exhibit Number 71,
7  your December 20th report. And we were speaking
8  about the impediments that your office had identified
9  to implementing the solution of recording VRS calls
10 via VCR or DVR recorder. I'm going to ask you a few
11 more questions about that.
12     One of the impediments that BOP has
13 identified to recording VRS calls using VCR or DVR is
14 that it is not automated. Is that correct?
15     A    That is correct.
16     Q    And isn't it correct that recording of TTY
17 calls is not automated either?
18     A    Correct.
19     Q    The BOP has identified as another
20 impediment to recording videophone calls through VCR
21 or DVR, one of the impediments being that using those
22 methods is not sufficiently robust to ensure that "a

1  significant number of recordings can be retained."
2           Is it true that's one of the impediments
3  that you have identified?
4       A    Yes.
5       Q    And isn't it true that the same impediment
6  is in place with respect to the recording of TTY
7  calls?
8       A    Could be.
9       Q    It could be how?  How could it be an
10 impediment -- I'm sorry, how could it be a concern
11 with respect to recording TTY calls?
12      A    Well, storage space.  That's the central
13 issue.  Eventually you run out of file...
14      Q    File cabinets?
15      A    File cabinets, yes.  So the answer would
16 then be yes.
17      Q    Another impediment that you have identified
18 with respect to recording videophones using a VCR or
19 DVR is that neither of those VCR or DVR solutions is
20 sufficiently robust to ensure that all VRS calls are
21 recorded.
22           Is that one of the impediments that you've

1    identified with respect to using a VCR or DVR?
2         A    Yes.
3         Q    Isn't that same concern also applicable to
4    recording of TTY calls?
5         A    Again, could be.
6         Q    And how could it be applicable to recording
7    TTY calls, how could that same concern be applicable?
8         A    Can you refresh me which page?
9         Q    Sure.  We're at page 9 of the December 20th
10   report, Bates number 4939.  We're at the second to
11   last paragraph, the last sentence of that paragraph.
12   It begins, "Unfortunately, neither of these
13   solutions."
14        A    All right.  Restate the last question,
15   please.
16        Q    Sure.  So the first part of that sentence
17   says, "Neither of these solutions," the VCR or DVR,
18   "are automated and neither is sufficiently robust to
19   ensure that all VRS calls are recorded."  Those are
20   the concerns about recording using VCR and DVR,
21   right?
22        A    Mm-hmm.  Yes.

1  Q    And you testified earlier, the concern here
2  is that BOP -- it's not automated in that BOP staff
3  would have to manually press play/record each time,
4  right?
5       A    Yes.
6       Q    Isn't that same concern present with TTY?
7       A    Yes.
8       Q    Another impediment you've identified here
9  on page 9 of page 4939 is that neither VCR recording
10 or DVR recording is sufficiently robust to ensure
11 that calls can be preserved with sufficient
12 identifying information.  Am I correct that's one of
13 the impediments for recording via phone using VCR or
14 DVR?
15      A    Yes.
16      Q    Isn't that same concern applicable to
17 recording TTY calls?
18      A    Yes.
19      Q    And that's because -- and why is that?
20 I'll say it that way.
21      A    Well, they're both storage of media, with a
22 small M, media.  And although the names, the inmates'

1    identifying information, such as their first and last
2    name or register number, could be inscribed on that,
3    there's no guarantee that's going to be permanently
4    embedded, unlike the electronic database of the
5    Inmate Telephone System, would preserve that with
6    sufficient network backups in perpetuity.
7         Q    Recording of TTY calls involves using a
8    logbook, right?
9         A    Manual.  Manual inscription logbook, as
10   well as compilation or filing of the written
11   transcript.
12        Q    And what kind of information is put in the
13   logbook for TTY?
14        A    Name, number, duration of call, and the
15   call number it was placed to.
16        Q    And so for TTY, the staff member has to
17   manually write that information down with respect to
18   each call?
19        A    Agreed, or entered on a computer log or
20   whatever.
21        Q    Right.  It's not automated, in that the
22   staff member has to record that information manually

1  in some way with each call?
2     A    That is correct.
3     Q    You also testified earlier that one of the
4  impediments to providing -- to recording videophone
5  using VHS or DVR is that another inmate or someone
6  else could possibly destroy or tamper with the tapes,
7  like the VHS tapes or CDs or DVDs.  Am I correct
8  that's a potential impediment to using this method?
9     A    Absolutely.
10    Q    And isn't it also correct that the same
11 risk is there with respect to the TTY printouts?
12    A    Yes.
13    Q    You also mentioned DOJ IT security
14 protocols earlier in connection with -- well, how did
15 those come up?  You tell me.  How did DOJ IT security
16 protocols factor in here?
17    A    Absolutely they factor in.
18    Q    And how do they factor in?

[redacted]

1    preexisted the agency's decision to implement
2    enterprise-wide solutions.
3        Q    In preparing this report, the December 20th
4    report, Plaintiffs' Exhibit 71, did you consider
5    whether the recording solutions, of recording through
6    a VCR or DVR, could be implemented following the same
7    protocols as TTY?
8        A    No, I did not.
9        Q    Why not?
10       A    Because when I'm tasked to evaluate any new
11   security technology or any device or application that
12   falls within that realm, the direction I have been
13   given is to look for an enterprise-wide solution, not
14   do one-offs, not do one for one institution.
15            When we pilot a new technology, if it's
16   successful there, then it's moved out to the whole
17   enterprise, for, one, we're a policy-driven agency,
18   consistency of policy; two, for cost effectiveness
19   value to the taxpayer dollar; and three, to maintain
20   security by an overarching centralized solution.
21       Q    Is the provision of video remote
22   interpreting that is at place in Tucson, is that an

1   enterprise-wide solution?
2       A     No.  That was the local solution
3   implemented as a result of that litigation.
4       Q     Are you aware that video remote
5   interpreting has not been implemented at Butner?
6       A     I'm aware there has been a waiver obtained
7   for VRI at Butner; but aware it's not been
8   implemented, yes.
9       Q     And why has it not been implemented at
10  Butner?
11      A     Because the policy decision has been made
12  not to implement it.
13      Q     Right.  And that's what I'm asking.  What's
14  the policy decision?
15      A     I'm not the policy maker.
16      Q     Do you know -- first of all, who is the
17  policy maker for that particular decision?
18      A     For that -- let me talk.
19      Q     Sure.
20      A     One thing at a time, if we could.  The
21  policy of the Bureau of Prisons is codified in
22  program statements that have some concomitant Code of

1  also allows the user to copy, delete, and edit the
2  information about each of the calls." And then the
3  last sentence reads, "Although this type of
4  functionality is desirable in a consumer grade
5  program, it is not compatible with the BOP's need to
6  record and preserve these calls in a way that is not
7  subject to tampering by inmates."
8      Am I correct that this portion I just read
9  articulates a concern, an impediment to BOP's
10 provision of videophones to deaf inmates?
11     A   Yes.
12     Q   In order for an inmate to tamper with the
13 recorded data, both the recording itself and the data
14 about date and time, etc., the inmate would need to
15 have access to the computer, the keyboard and mouse
16 running the program; isn't that right?
17     A   Correct.
18     Q   And if the separated solution I proposed
19 earlier were provided, where the monitor and webcam
20 were separated from the computer itself, this risk
21 here of tampering by inmates would also be
22 significantly reduced; isn't that correct?

1  A   Correct.

2  Q   And in connection with this particular
3  concern articulated on the top of page 9 in Exhibit
4  71, in preparing this report, you didn't consider the
5  separated solution that I described, right?

6  A   I did not.

7  Q   If you were to take that into consideration
8  now, would you write the report in the same way?

9  A   Recommendation -- the ultimate
10 recommendation would be the same.  For
11 enterprise-wide solution that met all the records and
12 security concerns, obviously if I studied that, I
13 would address the evaluation of that.  But I didn't.

14 Q   So that potential solution I proposed, the
15 separated solution as I'm now referring to it, would
16 not change the outcome of your recommendation?

17 A   Not on an enterprise level.

18 Q   What about at a local level?  Would it
19 change the outcome of your recommendation?

20 A   I would have to work with that individual
21 warden to address it.

22 Q   So your testimony is it might change the

1  live and recorded monitoring, whereas, you know,
2  absent that enterprise setup, the videophone or video
3  relay service, VRI, which is much less of a concern
4  because of the contractually obligated interpreter
5  for prison management events, they all have the same
6  attendant concerns.
7       Q    And all TTY calls are live monitored,
8  right?
9       A    Correct.
10      Q    And if you swapped out a videophone or
11 video relay device with TTY, there is no reason why
12 staff couldn't monitor it in the exact same way,
13 right?
14      A    Are you asking can staff provide direct
15 staff supervision for a video call?  Yes.  But again,
16 none of this stuff that I've articulated time and
17 time again, would be --
18      Q    Right.  So let's keep ticking through the
19 other stuff.  We talked about DOJ IT security
20 concerns.  And you mentioned, you said it's a thick
21 book, and there's many of them.  And you mentioned I
22 believe two in particular; one, data encryption.

1     A    Correct.

2     Q    But that could be solved by doing the --

3 using the Guardian program to encrypt recordings,

4 right?

5     A    Correct.

6     Q    The other DOJ particular IT security

7 standard we talked about was providing an unsecured

8 DSL line, right?

9     A    Well --

10     Q    That's part of --

11     A    Yes, that's part of it, counselor. But the

12 security standard is nothing that doesn't pass all

13 the standards will be attached to BOPNet or JUTNet,

14 Bureau of Prisons network or Department of Justice

15 network.

16     Q    So other than those two, so under the

17 umbrella of DOJ IT security concerns, just for the

18 moment, the DOJ IT security concerns, we've

19 identified two issues.

20     A    I've identified the two most important.

21     Q    What are other particular DOJ IT security

22 concerns that would be raised by provision of

1  solve this issue today and you picked up the phone,
2  who would you call first?
3       A    Probably the facility manager.
4       Q    And what's that person's name?
5       A    I don't know.
6       Q    But there's a particular facilities manager
7  assigned to --
8       A    We have 38,000 staff in the Bureau of
9  Prisons.  Yes.  Like I said, the individual I knew I
10 worked with on a number of projects, and has left
11 there.
12      Q    Who is that individual?
13      A    As previously stated, William Hammock.
14      Q    And you testified earlier that provision of
15 VRI at Tucson is not an enterprise-wide solution,
16 correct?
17      A    That's correct.
18      Q    And it has not been implemented across all
19 BOP institutions, and in fact, hasn't been
20 implemented at any other BOP institutions; is that
21 right?
22      A    That's correct.

1    Q    And why, given the importance of
2  implementing enterprise-wide solutions as you've
3  testified to, why is that the case, why is it only in
4  that one location?
5    A    Because it was implemented to resolve the
6  concern of that litigation.  That was my
7  understanding.  But again, I didn't do the site
8  survey.  I didn't do the evaluation.  I didn't ask
9  for or secure the waiver.
10   Q    And you're aware that the deposition that
11 you're sitting for today is in connection with
12 litigation arising out of the treatment of inmates at
13 Butner in North Carolina, correct?
14   A    I'm aware of that.
15   Q    And you're also aware that VRI has not been
16 provided to Mr. Heyer and Mr. Boyd in Butner?
17   A    I'm aware of that.
18   Q    Given that there is also litigation
19 demanding VRI, why has VRI not been implemented at
20 Butner?
21       MR. BREDENBERG:  Objection.  Speculation.
22 BY MR. HOFFMAN:

1    Q    Go ahead.
2    A    I'm not the warden of that facility, so I
3    would not make that final decision.
4    Q    Do you know why VRI has not been provided
5    at Butner?
6    A    I do not.
7    Q    At the very outset of the deposition,
8    counsel, your counsel, Ms. Dannels, made a note for
9    the record that you were designated to testify in
10   connection with two topics.  And one of those topics
11   that she described was defendants' consideration of
12   whether to provide plaintiffs with access to a
13   videophone and any impediments to providing such
14   access.
15        Would you agree that that is the deposition
16   topic for which you have been designated to testify
17   today?
18   A    Yes.
19   Q    And do you understand that "plaintiffs"
20   refers to plaintiffs, Mr. Tommy Heyer and Robert
21   Boyd?
22   A    Yes.