IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CT-3118-D

THOMAS HEYER and )
ROBERT PAUL BOYD, )
)
Plaintiffs, )
)                    **ORDER**
v. )
)
UNITED STATES BUREAU OF )
PRISONS, et al., )
)
Defendants. )

Thomas Heyer and Robert Paul Boyd are in the custody of the Bureau of Prisons pursuant

to 18 U.S.C. § 4248. Each has been designated a sexually dangerous person. Plaintiffs filed this

action pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S.

388 (1971) [D.E. 1]. On April 11, 2012, plaintiffs filed an amended complaint [D.E. 24].

On March 11, 2013, the court granted in part defendants' motion to dismiss, dismissing

counts one and five of the amended complaint, and denied without prejudice the parties' motions for

summary judgment. See Heyer v. U.S. Bureau of Prisons, No. 5:11-CT-3118-D, 2013 WL 943406

(E.D.N.C. Mar. 11, 2013) (unpublished). On September 23, 2013, the court denied defendants'

motion to stay and allowed an extension of time to complete discovery and to file dispositive

motions [D.E. 70]. The parties thereafter sought and obtained additional extensions of time to

complete discovery and file motions [D.E. 94–95, 99–102, 107, 120].

On August 21, 2014, defendants filed a second motion to dismiss or for summary judgment

[D.E. 111]. Because defendants attached materials that are outside the scope of the pleadings, the

court construes the motion as requesting summary judgment. See Fed. R. Civ. P. 12(d). On October

14, 2014, plaintiffs responded in opposition to the motion for summary judgment [D.E. 124]. On

October 28, 2014, plaintiffs moved for partial summary judgment on counts two, four, six, and eight

of the amended complaint [D.E. 127]. On November 18, 2014, defendants responded in opposition

to plaintiffs' motion for partial summary judgment [D.E. 130]. The parties also have filed motions

to seal certain exhibits and documents [D.E. 123, 132, 135, 138, 140], and defendants request leave

of court to conduct further audiology testing on Boyd [D.E. 134]. As explained below, the court

grants in part defendants' motion for summary judgment, denies plaintiffs' motion for partial

summary judgment, and dismisses the remaining counts as moot.

I.

Plaintiffs Thomas Heyer ("Heyer") and Robert Paul Boyd ("Boyd") have been civilly

committed to the custody of the Attorney General as sexually dangerous persons pursuant to 18

U.S.C. § 4248 and are confined at the Federal Correctional Institution in Butner, North Carolina

("Butner"), in the Commitment and Treatment Program ("CTP"). Am. Compl. [D.E. 24] ¶¶ 1–3;

see Order, United States v. Boyd, No. 5:08-HC-2061-D (E.D.N.C. Jan. 27, 2012), [D.E. 66], aff'd,

537 F. App'x 234 (4th Cir. 2013) (per curiam) (unpublished); Order, United States v. Heyer, No.

5:08-HC-2183-BO (E.D.N.C. July 9, 2012), [D.E. 81], aff'd, 740 F.3d 284 (4th Cir. 2014).

Plaintiffs are deaf. Am. Compl. ¶¶ 7, 11. Heyer has been deaf since birth, and his native

language is American Sign Language ("ASL"). Id. ¶¶ 7–8. "Heyer's ability to read lips is limited,"

id. ¶ 9, and his "English reading and writing skills are much lower than average." Id. ¶ 10; see Heyer

Decl. [D.E. 124-11] ¶ 1; Pls.' Ex. A [D.E. 122] 9–10 (audiology report). Heyer can communicate

with others through written notes, but "usually the person that's reading it does not understand what

[Heyer has] written because [he] write[s] in ASL and their language is English." Heyer Dep. [D.E.

112-4] 8 (deposition page 31). In October 2008, while Heyer was still serving his criminal sentence,

2

the Bureau of Prisons ("BOP") transferred him to Butner. Willis Decl. [D.E. 112-2] ¶ 9. On December 18, 2008, the United States filed a certificate pursuant to 18 U.S.C. § 4848(a) seeking Heyer's civil commitment as a sexually dangerous person. Id. ¶ 10; see § 4248(a) Certificate, United States v. Heyer, No. 5:08-HC-2183-BO (E.D.N.C. Dec. 18, 2008), [D.E. 1]. On July 8, 2012, after Heyer's commitment hearing, the court committed Heyer to the custody of the Attorney General pursuant to 18 U.S.C. § 4248(d). Order, United States v. Heyer, No. 5:08-HC-2183-BO (E.D.N.C. July 9, 2012), [D.E. 81], aff'd, 740 F.3d 284 (4th Cir. 2014); see Willis Decl. [D.E. 112-2] ¶ 12. Heyer entered the CTP that same month. Heyer Decl. [D.E. 124-11] ¶ 7. The CTP treatment team, however, did not include Heyer in any formal treatment until they secured an ASL interpreter. As the CTP treatment director acknowledges, the treatment team "cannot meaningfully communicate with Mr. Heyer without interpreters." Hernandez Dep. [D.E. 128-4] 3–4 (deposition pages 173–74); see Pls.' Ex. T [D.E. 122-9] (August 2, 2012 email); Steinour Dep. [D.E. 124-19] 7–9 (deposition pages 176–78).

Boyd "has been profoundly deaf since 1975, when he lost his hearing as a result of his military service." Am. Compl. ¶ 11; see Boyd Decl. [D.E. 124-12] ¶ 1. Boyd can communicate with others verbally by speaking to them and reading their lips, and by writing and using sign language. Boyd Dep. [D.E. 112-3] 22, 24 (deposition pages 68, 71); see Boyd Decl. [D.E. 124-12] ¶ 3; Pls.' Ex. A [D.E. 122] 3–5 (audiology report); cf. Am. Compl. ¶¶ 12–13 (alleging that Boyd uses ASL to communicate and his ability to read lips is limited). In March 2008, while Boyd was still serving his criminal sentence, the BOP transferred Boyd to Butner. Willis Decl. [D.E. 112-2] ¶ 4. On April 30, 2008, the United States filed a certificate pursuant to 18 U.S.C. § 4848(a) in this district seeking Boyd's civil commitment as a sexually dangerous person. Id. ¶ 5; see § 4248(a) Certificate, United States v. Boyd, No. 5:08-HC-2061-D (E.D.N.C. Apr. 30, 2008), [D.E. 1]. On January 27,

3

2012, the court committed Boyd to the custody of the Attorney General pursuant to 18 U.S.C. §
4248(d). Order, United States v. Boyd, No. 5:08-HC-2061-D (E.D.N.C. Jan. 27, 2012), [D.E. 66],
aff'd, 537 F. App'x 234 (4th Cir. 2013) (per curiam) (unpublished); see Willis Decl. [D.E. 112-2]
¶ 7. Boyd entered the CTP in approximately February 2012. Boyd Decl. [D.E. 124-12] ¶ 6.[1]

Plaintiffs allege that defendants have failed or refused to provide, inter alia, (1) qualified
ASL interpreters or other appropriate auxiliary aids for plaintiffs' treatment program under section
4248, medical appointments, disciplinary proceedings, vocational, educational, and religious
programs; (2) appropriate methods of non-aural notification of emergencies or other important
events or announcements; and (3) equal and consistent access to telecommunications devices that
would permit them to communicate with anyone outside of Butner. Am. Compl. ¶¶ 33, 36–62,
64–68. Plaintiffs assert that defendants' failure to implement such accommodations discriminates
against plaintiffs because of their disabilities and violates several federal laws and the Constitution.
Id. ¶¶ 79–140. Plaintiffs also assert that the conditions at Butner have adversely affected their ability
to engage in religious activities, in violation of the Religious Freedom Restoration Act and the First
Amendment. Id. ¶¶ 64, 141–54. Plaintiffs seek declaratory relief, injunctive relief, and attorneys'
fees. Id. 31–32.

## A.

Heyer and Boyd made multiple requests for ASL interpreters beginning in 2008. Heyer Dep.
[D.E. 124-9] 5–12, 19–21 (deposition pages 50–57,109–11); Boyd Dep. [D.E. 124-10] 9–11
(deposition pages 78–80); Heyer Decl. [D.E. 124-11] ¶ 3; Boyd Decl. [D.E. 124-12] ¶ 4. In

---

[1] On the advice of counsel, Boyd refused to participate in the CTP until the court ordered him
committed in July 2012. See Hearing Tr. at 43–44, United States v. Boyd, No. 5:08-HC-2061-D
(E.D.N.C. June 12, 2012), [D.E. 74].

4

September 2012, Butner entered into a contract with a third party to provide certified ASL interpreters to Boyd and Heyer for group therapy sessions, morning community meetings with all participating members of the CTP, and Multidisciplinary Treatment Team meetings. See Malterer Decl. [D.E. 112-6] ¶¶ 5–6, 8–11; see also Heyer Dep. [D.E. 112-4] 19 (deposition page 133); Pls.' Exs. U [D.E. 124-21], Pls.' Ex. BB [D.E. 124-28].[2] Plaintiffs contend that "[e]ven with interpreters, [they] sometimes feel [they] cannot understand what is being communicated in the CTP programs due to the speed at which the hearing inmates and CTP staff speak." Heyer Decl. [D.E. 124-11] ¶ 8; Boyd Decl. [D.E. 124-12] ¶ 7. Heyer also believes (upon information from Boyd and another CTP inmate) that the interpreters "may not fully understand [his] signing, and therefore may not effectively relay [his] communications to CTP staff." Heyer Decl. [D.E. 124-11] ¶ 9.

In February 2013, Butner increased its contracted interpreter service to Heyer, providing him with an ASL interpreter for weekly individual therapy sessions. Malterer Decl. [D.E. 112-6] ¶ 7. Although Boyd does not receive individual therapy as frequently as Heyer, Butner will provide him with an ASL interpreter for individual therapy sessions upon his request. Malterer Decl. [D.E. 112-6] ¶ 13; see Boyd Dep. [D.E. 112-3] 41 (deposition page 173); but see Boyd Decl. [D.E. 124-12] ¶ 9.[3] The parties dispute whether Boyd has ever requested an interpreter for individual therapy, or has

---

[2] In ordering Heyer's commitment, the court directed the BOP to "make reasonable accommodations to allow Mr. Heyer to participate in its sex offender treatment program" by "provid[ing] an interpreter through whom Mr. Heyer can meaningfully participate in the treatment program." Order at 7, United States v. Heyer, No. 5:08-HC-2183-BO (E.D.N.C. July 9, 2012), [D.E. 81]. On April 28, 2015, the court will conduct a hearing to determine Heyer's continuing need for involuntary commitment pursuant to 18 U.S.C. § 4247(h). Order, United States v. Heyer, No. 5:08-HC-2183-BO (E.D.N.C. Mar. 5, 2015), [D.E. 115].

[3] Boyd acknowledges that he does not meet with his treating psychologist "as often as she would like" due to "trust issues with staff" in addition to difficulty "understand[ing] exactly what they're trying to say" and "[m]iscommunication on both parts." Boyd Dep. [D.E. 112-3] 41–42 (deposition pages 173–74).

expressed any communication difficulties to his therapist when there is no interpreter present for their individual therapy sessions. Compare Malterer Decl. [D.E. 112-6] ¶ 13, and Boyd Dep. [D.E. 112-3] 42 (deposition page 174), with Boyd Decl. [D.E. 124-12] ¶ 9. On one occasion, Boyd was interviewed "[w]ith great difficulty" by another psychiatrist to determine whether he might be eligible for discharge from the CTP. Boyd Dep. [D.E. 112-3] 40 (deposition page 172). Boyd had no advance notice of the meeting and did not request an interpreter during the meeting. Id. 41 (deposition page 173).

Butner provides plaintiffs with additional auxiliary aids. Since at least 2010, Heyer has been assigned an inmate companion ("ICP") "to assist in [his] everyday needs and functioning." Willis Decl. [D.E. 112-2] ¶ 26; see Heyer Dep. [D.E. 112-4] 10 (deposition page 97); Heyer Decl. [D.E. 124-11] ¶¶ 5–6. ICPs are not certified ASL interpreters. See Pls.' Ex. B [D.E. 124-2] 27–30 (Cokely Report pages 25–28); Pls.' Ex. M [D.E. 124-13] 3 (defendants' responses to plaintiffs' requests for admissions). Heyer's ICPs have assisted him by communicating his food requests during meals, accompanying him to the inmate commissary to purchase goods, and notifying him of mealtime announcements made over the loudspeaker. Heyer Dep. [D.E. 112-4] 11–12 (deposition pages 99–100). Boyd is not currently assigned an ICP, and the parties dispute whether he has ever requested one. Compare Boyd Dep. [D.E. 124-10] 25–26 (deposition pages 103–04), and Boyd Decl. [D.E. 124-12] ¶ 5, with Willis Decl. [D.E. 112-2] ¶ 27.

Butner has provided Boyd "hearing aids for both ears, a COM-Pilot with remote microphone, and a Y-cord that enables him to hear via an FM signal." Evans Decl. [D.E. 112-5] ¶ 10; cf. Boyd Dep. [D.E. 112-3] 19–20, 42 (deposition pages 62–63, 174). Boyd used to have significant difficulty obtaining hearing aid batteries, and "was expected to go for a week without a hearing aid." Boyd Dep. [D.E. 112-3] 19 (deposition page 62); see Am. Compl. ¶ 123. When Boyd complained to

6

Butner staff about the problem, "they[] made it . . . so that any one of us that have the hearing aids can get a battery at any pill line call." Boyd Dep. [D.E. 112-3] 19 (deposition page 62). Boyd further acknowledges that Butner has now provided him with hearing aids that "are top of the line. They're new and they're about the most powerful they make." Id. [D.E. 112-3] 18 (deposition page 59); see Defs.' Resp. Opp'n Pls.' Mot. Part. Summ. J., Ex. 24 [D.E. 130-11] 2 (June 6, 2014 medical note indicating that Boyd "stated he understand every thing with his new hearing aids"). In 2011, Butner also provided Boyd with a whiteboard. Boyd Dep. [D.E. 124-10] 12 (deposition page 81).

Butner does not provide either Heyer or Boyd with an interpreter for "ancillary activities . . . . such as Yoga or Horticulture" or socializing with other CTP inmates, or for CTP evening meetings, which "generally occur two times a week after hours when treatment staff have left the facility." Malterer Decl. [D.E. 112-6] ¶¶ 17, 19; see Heyer Decl. [D.E. 124-11] ¶¶ 10–11; Boyd Decl. [D.E. 124-12] ¶ 10; Hernandez Dep. [D.E. 124-14] 37–38, 40 (deposition pages 114–15, 120); Am. Compl. ¶ 49. At these evening meetings, "an inmate-recorder writes down all relevant information discussed" and "[u]sually the following day, these notes are read aloud at the community meeting where a[n] . . . interpreter is present to interpret." Malterer Decl. [D.E. 112-6] ¶ 19; cf. Boyd Decl. [D.E. 124-12] ¶ 10 (describing the minutes as "a quick recap"). Heyer receives interpretive assistance during the meetings from two other CTP inmates, including Boyd. Heyer Dep. [D.E. 112-4] 13–14 (deposition pages 102–03).

The CTP treatment team believes that ancillary activities "assist the overall process" by "maximiz[ing] the opportunities for therapeutic gain and generalization." Hernandez Dep. [D.E. 124-14] 26 (deposition page 95). "[P]articipating in the informal activities of the [CTP] therapeutic community . . . is essential to treatment, treatment outcome, and essential to [the treatment team's]

7

evaluation of progress." Id. [D.E. 124-14] 31 (deposition page 100). The CTP treatment team "ha[s] ongoing concerns about [Heyer's] ability to extract maximum benefit from the therapeutic community as a treatment modality" without an interpreter and has an "ongoing dialogue . . . to consider when do [they] need to provide more, expanded scope of services" to Heyer. Id. [D.E. 124-14] 42 (deposition page 176); see Hernandez Dep. [D.E. 128-4] 4 (deposition page 174).

## B.

"Heyer has never been sanctioned through a disciplinary hearing while incarcerated with the BOP." Willis Decl. [D.E. 112-2] ¶ 15; cf. Heyer Dep. [D.E. 112-4] 16 (deposition page129); Am. Compl. ¶ 50. Should Heyer face a disciplinary proceeding, "the BOP will provide inmate Heyer with a qualified interpreter through either in-person interpreting services or video remote interpreting ('VRI') services." Willis Decl. [D.E. 112-2] ¶ 16. Butner's Unit Disciplinary Committee ("UDC") has sanctioned Boyd on six occasions. Id. ¶ 18. The UDC sanctioned Boyd with the loss of commissary privileges, use of the inmate telephone, and visitation privileges, and removal from work detail for periods of time ranging from 60 days to one year. Id. ¶ 18. Butner did not provide Boyd with an interpreter for any disciplinary proceeding against him until September 2013, when an interpreter informed Boyd of his charges but was not present "for any other aspect of that proceeding, including the hearing itself." Boyd Decl. [D.E. 124-12] ¶¶ 13–14; see Boyd Dep. [D.E. 112-3] 38 (deposition page 149). Defendants indicate that in any future disciplinary proceeding, "the BOP will provide inmate Boyd with a qualified interpreter upon his request through either in-person interpreting services or VRI, provided that other auxiliary aids, such as hearing aids, written materials, etc., do not offer a means of effective communication." Willis Decl. [D.E. 112-2] ¶ 17. Boyd alleges that his unit counselor, who presides over Boyd's disciplinary proceedings, "has repeatedly told Mr. Boyd that he does not believe Mr. Boyd is deaf and has refused him effective

8

communication in the form of a qualified ASL interpreter and other auxiliary aids on this ground." Am. Compl. ¶¶ 15, 50.

C.

At Butner, Heyer and Boyd reside on a housing unit known as the Maryland Unit. See, e.g., Heyer Decl. [D.E. 124-11] ¶ 6; Boyd Dep. [D.E. 124-10] 5 (deposition page 74). The Maryland Unit always has had twelve emergency notification strobe lights installed throughout the unit, and in March 2014, "Butner installed four additional emergency strobe lights in four individual cells in the Maryland Unit." Willis Decl. [D.E. 112-2] ¶ 23; see Heyer Decl. [D.E. 124-11] ¶ 15; Boyd Decl. [D.E. 124-12] ¶ 19. "Butner also has a policy and procedure in place that requires correctional officers to conduct a thorough search of each room and all other areas to ascertain if everyone has been evacuated in the event of an emergency." Willis Decl. [D.E. 112-2] ¶ 25. Heyer states that on one occasion, "[a]nother inmate—not a BOP staff member—had to physically retrieve" him from his cell at night during a fire alarm "because of the similarity between the new flashing strobe light and the periodic flashing of BOP staff flashlights in my window at night." Heyer Decl. [D.E. 124-11] ¶ 16. Heyer and Boyd are both assigned to cells that contain a strobe light, and will continue to remain assigned to those cells "[a]bsent any exigent circumstances." Willis Decl. ¶ 24; see Heyer Decl. [D.E. 124-11] ¶ 15; Boyd Decl. [D.E. 124-12] ¶ 19. Heyer and Boyd cannot see any of the strobe lights if they are "in the shower in the common bathroom area." Heyer Decl. [D.E. 124-11] ¶ 16; Boyd Decl. [D.E. 124-12] ¶ 19. Butner has not installed any other safety devices, such as "vibrating pagers, vibrating watches, vibrating bed devices, or message boards." Am. Compl. ¶ 60; see also Heyer Dep. [D.E. 112-4] 13 (deposition page 102) (indicating that staff notify Heyer of alarms by waving their arms). Additionally, Butner has denied Boyd's request for a vibrating alarm

9

clock to assist him in ensuring that he wakes up in time to attend morning CTP meetings. Boyd Decl. [D.E. 124-12] ¶ 20.

## D.

"Plaintiffs cannot use a telephone in the same way as a hearing person. Instead, they require a TTY, a videophone, or a CapTel phone." Am. Compl. ¶ 53. Heyer and Boyd have access to two TTY devices at Butner. Willis Decl. [D.E. 112-2] ¶ 19; see Pls.' Ex. FF [D.E. 122-4] (log of TTY calls); cf. Am. Compl. ¶ 54 ("The Maryland Unit has only one TTY device"); Boyd Decl. [D.E. 124-12] ¶¶ 15–17. Butner provided TTY training to the four members of the Maryland Unit Team staff, along with "the various Lieutenants, the two chaplains assigned to FCI Butner, and all other unit team members located at" Butner. Willis Decl. [D.E. 112-2] ¶ 19; cf. Am. Compl. ¶ 54.

Plaintiffs allege that their access to the TTY devices "is regularly restricted or denied." Am. Compl. ¶ 56; see Heyer Decl. [D.E. 124-11] ¶ 13; Boyd Decl. [D.E. 124-12] ¶ 15; Pls.' Ex. EE [D.E. 124-30] (handwritten notes indicating denied requests); Boyd Dep. [D.E. 124-10] 27 (deposition page 110); cf. Weaver Dep. [D.E. 112-9] 5 (deposition page 201) (acknowledging that "sometimes you can't just walk in my office and say, hey, I need to make a phone call right this minute"). The parties dispute whether plaintiffs are required to submit a formal written request to use the TTY. Compare Boyd Dep. [D.E. 124-10] 27 (deposition page 110), with Weaver Dep. [D.E. 112-9] 5–6 (deposition pages 201–02). During this litigation, Butner staff have increased plaintiffs' access to the TTY device until 9:00 p.m. on certain weekdays and will coordinate weekend access so long as "Heyer and Boyd . . . request the TTY call from their Unit Team by 10:00 am on Friday." Willis Decl. [D.E. 112-2] ¶¶ 20, 22. Non-deaf CTP inmates are generally not required to request advance permission to use the telephone. Weaver Dep. [D.E. 112-9] 3 (deposition page 196).

10

For security reasons, non-deaf CTP inmates must use Butner's inmate telephone system, which records conversations, limits telephone calls to fifteen minutes,[4] and prohibits calls to certain numbers. Weaver Dep. [D.E. 112-9] 3–4, 9 (deposition pages 196, 200, 240). The nature of a TTY device presents security concerns for Butner officials, because it must be placed on an unmonitored staff telephone line. Weaver Dep. [D.E. 112-9] 4–5 (deposition pages 200–01); see Willis Decl. [D.E. 112-2] ¶ 21. Thus, Butner "[s]taff must physically monitor the use of the TTY to ensure that the inmate is not tampering with the equipment, and to ensure that the conversation is being recorded . . . in order to preserve the security and orderly management of the institution and to protect the public." Willis Decl. [D.E. 112-2] ¶ 21. Boyd states that a Florida state prison permitted him to own a TTY device, "which was stored securely in an officer's station when not in use" and was made available upon request. Boyd Decl. [D.E. 124-12] ¶ 18.

In May 2013, the BOP evaluated "the potential use of videophones at the Federal Correctional Complex in Tucson, Arizona," and concluded that videophone technology is not feasible for federal inmates due to "conflicts between use of the videophone and both BOP and Department of Justice IT security requirements," security risks, and a lack of compatibility between videophones and the BOP's telephone system. Craig Decl. [D.E. 112-11] ¶¶ 3–6. In 2010, a Virginia state prison entered into an agreement to provide a videophone for its deaf inmates and "implemented polices and procedures . . . [which] include[] monitoring, recording, and storing, as well as blocking to prevent recording and monitoring of attorney-client communications." Pls.' Ex.

---

[4] "Heyer and Boyd are routinely allowed to exceed this maximum time limit when using the TTY device." Willis Decl. ¶ 22; see Boyd Dep. [D.E. 112-3] 30–31 (deposition pages 122–23); Heyer Dep. [D.E. 124-9] 44 (deposition page 163). Butner also does not require Heyer and Boyd to pay for their "telephone calls, unlike hearing inmates who must pay for each minute of telephone use." Willis Decl. ¶ 22; see Boyd Dep. [D.E. 112-3] 31 (deposition page 123).

11

R [D.E. 124-18] 20 (December 11, 2013 expert report of Richard Ray, page 19). Both Heyer and Boyd have access to the BOP's inmate email system, and use it to communicate with family members, friends, and attorneys. Boyd Dep. [D.E. 112-3] 32–33 (deposition pages 124–25); Heyer Dep. [D.E. 112-4] 37–38 (deposition pages 165–66).

E.

In December 2012, Butner began providing ASL interpreters to plaintiffs for medical appointments. See Jacobs Dep. [D.E. 124-15] 3 (deposition page 81); Evans Decl. [D.E. 112-5] ¶ 7; cf. Heyer Dep. [D.E. 112-4] 19 (deposition page 133). Even after December 2012, however, Butner does not always provide plaintiffs with an ASL interpreter for all medical visits or encounters. Jacobs Dep. [D.E. 124-15] 27–30 (deposition pages 160–63); Boyd Decl. [D.E. 124-12] ¶ 12; Evans Decl. [D.E. 112-5] ¶ 11; Jacobs Dep. [D.E. 130-10] 8–9 (deposition pages 157–58) (testifying about the difficulties presented by Butner's medical records system in assisting her with knowing when to schedule interpreters). Butner has contemplated providing ASL interpreters to plaintiffs via VRI for medical emergencies, but has not yet done so. Compare Evans Decl. [D.E. 112-5] ¶ 9 (Butner "has identified a provider and secured a contract so that VRI services will be available in the very near future to Mr. Heyer."), with Craig Dep. [D.E. 128-7] 9 (deposition page 155) ("[T]here has been a waiver obtained for VRI at Butner; but . . . it's not been implemented . . . . [b]ecause the policy decision has been made not to implement it."), and Andrews Decl. [D.E. 44-1] ¶ 5 ("FCI Butner is no longer considering [VRI] at this time."), and Defs.' Resp. Opp'n Pls.' Mot. Part. Summ. J. [D.E. 130] 24–25. The BOP has provided VRI services for medical encounters at USP-Tucson since 2012. See Pls.' Ex. P [D.E. 124-16] 4 (defendants' response to interrogatories); cf. Craig Dep. [D.E. 128-7] 8–9 (deposition pages 154–55) (noting that VRI "was the local solution

12

implemented as a result of that litigation"). A Virginia state prison also provides VRI for deaf inmates' medical encounters. See Marano Dep. [D.E. 128-6] 27–28 (deposition pages 26–27).

Between 2008 and 2012, plaintiffs had a number of health conditions requiring medical treatment, including seizures, Bell's Palsy, high blood pressure, high cholesterol, broken teeth, and tooth infections. Am. Compl. ¶¶ 37–48; Heyer Dep. [D.E. 112-4] 20–33 (deposition pages 134–47); Heyer Decl. [D.E. 124-11] ¶ 12; Boyd Decl. [D.E. 124-12] ¶¶ 11–12. Without an ASL interpreter, Heyer has had to rely on either Boyd or an ICP to assist him at his medical appointments. Heyer Decl. [D.E. 124-11] ¶ 12; Heyer Dep. [D.E. 112-4] 17–19 (deposition pages 131–33); Pls.' Ex. X [D.E. 122-11] (May 7, 2013 medical note indicating that Heyer's "interpreter was inmate Sheraden"); Jacobs Dep. [D.E. 124-15] 30 (deposition page 163). Defendants acknowledge that this occurred "regularly, frequently maybe," Jacobs Dep. [D.E. 124-15] 5 (deposition page 97), even though the process raised legal and privacy concerns. See Pls.' Ex. Z [D.E. 122-13] (July 6, 2012 email from Steinour); Johns Dep. [D.E. 124-22] 6 (deposition page 60); Andrews Dep. [D.E. 124-27] 5–6 (deposition pages 137–38).[5] On April 5, 2013, a radiologist was unable to perform a CT scan with contrast on Heyer because he had no interpreter with him and the radiologist could not "screen or clear" Heyer for the scan. Pls.' Ex. W [D.E. 122-10] 2. The radiologist did perform a CT scan without contrast. Id. Heyer received another CT scan a few days later, and Jacobs testified that her failure to schedule an interpreter on April 5 was inadvertent. Jacobs Dep. [D.E. 124-15] 27–28 (deposition pages 160–61). In May 2013, Heyer suffered from a seizure after missing three days of a prescription medication. Pls.' Ex. X [D.E. 122-11] 2. Heyer "requested to change his pill line

_____

[5] The court has dismissed plaintiffs' Fifth Amendment claim alleging a right to medical privacy. Heyer, 2013 WL 943406, at *3.

13

medication from am to noon, because he is having a problem to wake up in the morning for his pills," and his medical provider ordered the schedule change. Id. 2–4.

F.

Lynn McLaughlin is a BOP chaplain assigned to "provide pastoral care and programming to inmates in the CTP unit." McLaughlin Decl. [D.E. 112-12] ¶ 4. The BOP provides these "inmates with a qualified interpreter . . . during religious ceremonies or programs offered by FCI Butner" so long as the inmate requests such accommodation at least 72 hours in advance, in order to "allow staff to schedule an interpreter from the existing contract." Id. ¶¶ 8–9.[6] McLaughlin has communicated with Heyer and Boyd, and "neither Mr. Heyer nor Mr. Boyd has ever asked [McLaughlin] for an interpreter or other auxiliary aid for the purpose of participating in a religious program or ceremony," nor "indicated to [McLaughlin] a desire to participate in any sort of congregational religious ceremony or program where an interpreter would be necessary or even helpful." Id. ¶¶ 4–6; cf. Heyer Dep. [D.E. 124-9] 14–31 (deposition pages 104–21) (describing requests to individuals other than McLaughlin for an interpreter for religious services); Boyd Dep. [D.E. 124-10] 9–11 (deposition pages 78–80) (describing a request in 2008 to Chaplain May).

According to the amended complaint, "Boyd consistently attended religious services at prior corrections institutions where a volunteer interpreter was consistently provided." Am. Compl. ¶ 64. "Boyd has signed up to have access to the outside worship area where he can practice his chosen faith, which lends itself to individual practice." McLaughlin Decl. [D.E. 112-12] ¶ 6. According to Heyer, he does not attend religious services at Butner "because there's no interpreter." Heyer Dep. [D.E. 124-9] 14 (deposition page 104).

_____

[6] The Virginia prison system does not provide paid ASL interpreters for "regular religious programs." Marano Dep. [D.E. 128-6] 86, 97, 180 (deposition pages 85, 96, 179).

14

II.

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A.

In count two, plaintiffs assert that defendants violated their due process rights under the Fifth Amendment by "systematically denying Plaintiffs the means of effective communication, including the services of a qualified ASL interpreter, in the context of the treatment programs for persons committed pursuant to [section] 4248." Am. Compl. ¶ 99.

"[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425 (1979). Thus, the Fifth

15

Case 5:11-ct-03118-D   Document 142   Filed 03/31/15   Page 15 of 28

Amendment generally prohibits civilly-committed persons from being subjected to punitive confinement conditions. See, e.g., Youngberg v. Romeo, 457 U.S. 307, 321–22 (1982); Jones v. Blanas, 393 F.3d 918, 931–32 (9th Cir. 2004). For an individual who is involuntarily committed, "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which [the person is civilly] committed." Seling v. Young, 531 U.S. 250, 265 (2001). Thus, involuntarily-committed persons "enjoy[] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." Youngberg, 457 U.S. at 324.

"In determining what is 'reasonable' . . . courts must show deference to the judgment exercised by a qualified professional." Id. at 322; see Lane v. Williams, 689 F.3d 879, 882–83 (7th Cir. 2012); Allison v. Snyder, 332 F.3d 1076, 1080–81 (7th Cir. 2003). Moreover, the Supreme Court has "never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." Kansas v. Hendricks, 521 U.S. 346, 366 (1997); see United States v. Comstock, 560 U.S. 126, 131 (2010) (noting that pursuant to 18 U.S.C. § 4247(e), "[c]onfinement in the federal facility will last until . . . the person's mental condition improves to the point where he is no longer dangerous (with or without appropriate ongoing treatment)" or until a state assumes custody); Strutton v. Meade, 668 F.3d 549, 557 (8th Cir.), cert. denied, 133 S. Ct. 124 (2012); Burch v. Jordan, 444 F. App'x 236, 238–39 (10th Cir. 2011) (unpublished); Conover v. Main, Civ. A. No. 11-6324 PGS, 2013 WL 1145517, at *6–7 (D.N.J. Mar. 18, 2013) (unpublished); Semler v. Ludeman, Civ. No. 09-0732 ADMSRN, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010) (unpublished); but see Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir. 2000) (stating that the "Due Process Clause requires states to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and

16

released"); cf. Leamer v. Fauver, 288 F.3d 532, 544–45 (3d Cir. 2002) (holding that where an imprisoned criminal defendant's confinement and treatment are "inextricably linked," then the defendant has a "liberty interest in treatment [that] is fundamental and cognizable for purposes of both the procedural and substantive due process analyses"). Furthermore, "the Constitution does not immediately fall into line behind the majority view of a committee appointed by the American Psychiatric Association." West v. Schwebke, 333 F.3d 745, 749 (7th Cir. 2003); see United States v. Caporale, 701 F.3d 128, 135–37 (4th Cir. 2012); Allison, 332 F.3d at 1081.

Although plaintiffs have been detained at Butner since 2008, they chose to not enter the CTP until 2012. Defendants secured interpreter services for Heyer within two months after he entered the CTP and within seven months after Boyd entered the CTP. See Pls.' Mem. Supp. Mot. Part. Summ. J. [D.E. 128] 9–10. Plaintiffs do not argue that defendants failed to provide them with any treatment. Rather, they contend that this delay in getting interpreter services once they joined the CTP, and the inherent limitations in the effectiveness of the CTP for them, may have some effect on how long they remain involuntarily committed. See id. 25–26. Thus, plaintiffs claim that defendants thereby violated their procedural and substantive due process rights. See id.

As for plaintiffs' procedural due process argument, plaintiffs contend that they were denied "constitutionally adequate procedures" because they can not be "'heard' in a 'meaningful manner'" without qualified ASL interpreters. Pls.' Resp. Opp'n Defs.' Mot. Summ. J. [D.E. 124] 19–20; see Pls.' Mem. Supp. Mot. Part. Summ. J. [D.E. 128] 9–10.[7] Defendants acknowledge that Heyer

---

[7] Plaintiffs' memorandum does a poor job of clarifying on what theory plaintiffs base this claim. However, plaintiffs' version of the facts implies that their argument is based, in part, on the idea that plaintiffs' inability to "participate meaningfully in the CTP program" violated at least Boyd's due process rights by keeping him from "requesting a new commitment hearing" pursuant to 18 U.S.C. § 4247(h). See Pls.' Mem. Supp. Mot. Part. Summ. J. [D.E. 128] 10. To the extent plaintiffs rely on this theory, the court rejects the argument because there is no evidence that Boyd

17

and Boyd did not have access to qualified ASL interpreters until September 2012, but claim that "the lack of interpreters had minimal effect on [their] progress in treatment" and that both Heyer and Boyd completed phase one of the treatment plan in a time-frame consistent with, if not faster, than "most other hearing inmates in the CTP." Defs.' Resp. Opp'n Pls.' Mot. Part. Summ. J. [D.E. 130] 4–12.

Plaintiffs have failed to raise a genuine issue of material facts concerning whether the lack of ASL interpreters for their first few months of CTP treatment resulted in an "atypical and significant" hardship or hindered their progress in such a way as to affect how long plaintiffs may remain involuntarily committed. See Sandin v. Conner, 515 U.S. 472, 484–87 (1995) ("Nor does [plaintiffs'] situation present a case where the [defendants'] actions will inevitably affect the duration of [their] sentence. . . .The chance that [it] will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause."); Beebe v. Heil, 333 F. Supp. 2d 1011, 1017 (D. Colo. 2004) (noting that in determining whether a civilly committed person has suffered a procedural due process violation, courts must consider whether the limitation suffered "constitutes an 'atypical and significant' hardship"). Moreover, defendants have agreed to provide plaintiffs with interpreter services upon request for all future individual therapy sessions, see Malterer Decl. [D.E. 112-6] ¶¶ 7, 13, and plaintiffs have not raised a genuine issue of material fact concerning whether the lack of interpreters during ancillary activities has resulted in an atypical and significant hardship. Thus, although the parties dispute several facts, plaintiffs have failed to raise a genuine

---

ever intended or attempted to request a hearing or that the lack of ASL interpreters affected his ability to do so.

18

issue of material fact regarding whether they have been deprived of a cognizable liberty interest.[8]

As for plaintiffs' substantive due process argument, plaintiffs have failed to raise a genuine issue of material fact. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 719–35 (1997); Lopez v. Christie, Civ. A. No. 10-3725 SRC, 2010 WL 4940968, at *11 (D.N.J. Nov. 24, 2010) (unpublished). Thus, the court denies plaintiffs' motion for partial summary judgment, and grants defendants' motion for summary judgment on this claim.

B.

In count three, plaintiffs assert that defendants violated their due process rights under the Fifth Amendment by failing to provide ASL interpreters in connection with disciplinary proceedings. Am. Compl. ¶ 104. Placement of a civil detainee "in a prison, subject to the institution's usual rules of conduct," does not per se signify punishment. Allison, 332 F.3d at 1079. "Disciplinary measures that do not substantially worsen the conditions of confinement of a lawfully confined person are not actionable under the due process clause, . . . regardless of whether the confinement is criminal or civil." Miller v. Dobier, 634 F.3d 412, 414–15 (7th Cir. 2011) (citation omitted). "Put another way, unless the deprivation of liberty is in some way extreme, then the Constitution does not require that a prisoner be afforded any process at all prior to deprivations beyond that incident to normal prison

_____

[8] Plaintiffs' confinement constitutes a deprivation of liberty. The Fourth Circuit, however, has not decided whether civilly-committed persons have a liberty interest in mental-health treatment, and there appears to be a circuit split on the issue. Compare Strutton 668 F.3d at 557, and Burch, 444 F. App'x at 238, with Sharp, 233 F.3d at 1172. Here, plaintiffs cleverly claim that the liberty interest at stake is an extended confinement issue, rather than a treatment issue. The court recognizes, however, that this "back-door" approach essentially questions the adequacy of the CTP treatment provided to plaintiffs. See Pls.' Resp. Opp'n Defs.' Mot. Summ. J. [D.E. 124] 19–20. Nevertheless, this court need not decide whether plaintiffs have a liberty interest in receiving mental-health treatment because, assuming without deciding that plaintiffs have a cognizable liberty interest in receiving mental-health treatment, plaintiffs have failed to raise a genuine issue on whether they have been meaningfully deprived of that interest.

19

life." Deavers v. Santiago, 243 F. App'x 719, 721 (3d Cir. 2007) (unpublished) (emphasis omitted).

As for Boyd, Boyd has failed to demonstrate that the disciplinary proceedings subjected him to sanctions that dramatically worsened his confinement terms. Boyd's temporary loss of certain privileges does not constitute the type of extreme deprivation that is actionable under the due process clause. See, e.g., Strutton, 668 F.3d at 558; English v. Johns, No. 5:11-CT-3206-D, 2014 WL 555661, at *7 (E.D.N.C. Feb. 11, 2014) (unpublished), aff'd, 582 F. App'x 229 (4th Cir. 2014) (per curiam) (unpublished); Timms v. Johns, No. 5:10–CT–3210–BO, 2013 WL 6577379, at *5 (E.D.N.C. Dec. 13, 2013) (unpublished); Francis v. Johns, No. 5:11–CT–3005–FL, 2013 WL 1309285, at *7 (E.D.N.C. Mar. 28, 2013) (unpublished). Thus, the court grants summary judgment to defendants on Boyd's claim.

As for Heyer, Heyer has never been subject to disciplinary proceedings as a detainee at Butner. Thus, Heyer lacks standing to assert a due process claim concerning disciplinary proceedings, and the court dismisses count three without prejudice as to Heyer. See, e.g., Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).

C.

The parties analyze counts four and six together in their cross motions for summary judgment. See Defs.' Mem. Supp. Mot. Summ. J. [D.E. 112] 45–50; Pls.' Mem. Supp. Mot. Part. Summ. J. [D.E. 128] 26–28. In count four, plaintiffs allege a Fifth Amendment due process violation because defendants' failure to provide them with the assistance of an interpreter and other accommodations for their deafness resulted in constitutionally-inadequate medical examinations and treatment. Am. Compl. ¶¶ 106–12. In count six, Boyd alleges that defendants failed to provide him adequate medical treatment in the form of access to functioning batteries for his hearing aids. Am. Compl. ¶¶ 120–26.

20

To establish a Fifth Amendment claim for denial of medical care, a civil detainee must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).[9] To act with deliberate indifference, a defendant must know of and purposefully ignore "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id.; see Makdessi v. Fields, No. 13-7606, 2015 WL 1062747, at *5–6 (4th Cir. Mar. 12, 2015); De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013). It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999); Iko v. Shreve, 535 F.3d 225, 241–42 (4th Cir. 2008).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); see Estelle, 429 U.S. at 105–06; Iko, 535 F.3d at 241; De'lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003); Grayson, 195 F.3d at 695. Instead, an inmate must prove that the

_____

[9] As federal civil detainees, plaintiffs' claims of deficient medical care "properly arise[] under the Due Process Clause of the Fifth Amendment; nevertheless, the legal standard employed for civil commitment claims under the Due Process Clause is largely the same as that used in analyzing prisoners' Eighth Amendment claims." Hicks v. James, 255 F. App'x 744, 748 (4th Cir. 2007) (per curiam) (unpublished) (collecting cases).

medical provider's actions (or inactions) were so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." See Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (unpublished) (quotation omitted). A detainee's mere disagreement with a medical provider's course of treatment will not support a Fifth Amendment claim. Jackson, 536 F. App'x at 357; Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam).

Boyd appears to have abandoned count six. See Pls.' Mem. Supp. Mot. Part. Summ. J. [D.E. 128] 26–28 (focusing only on the need for interpreters for medical encounters). In any event, defendants are entitled to summary judgment on the claim. Notably, Boyd's testimony shows that when he complained to Butner staff about both his need for increased access to hearing aid batteries and the quality of the batteries provided, Butner staff responded by dramatically increasing his access and providing him with "top of the line" hearing aids. Thus, Boyd has failed to show that defendants were deliberately indifferent to a serious medical need, and the court grants summary judgment to defendants on count six of the amended complaint, and denies plaintiffs' motion for partial summary judgment on count six.

As for count four, the record shows that without an ASL interpreter at medical encounters, plaintiffs—Heyer in particular—do not receive optimal medical care. The constitution, however, does not require optimal medical care. It requires "adequate" medical care. Estelle, 429 U.S. at 105. Although plaintiffs cite several cases finding that a failure to provide deaf patients with ASL interpreters for medical treatment violates the Rehabilitation Act ("RA"), the court must determine whether such a failure constitutes deliberate indifference under the Fifth Amendment. See White v. City of Tacoma, No. C12-5987 RBL, 2014 WL 172037, at *15–16 (W.D. Wash. Jan. 15, 2014) (unpublished) (denying summary judgment on a RA claim for failure to provide ASL interpreter for

medical treatment, but granting summary judgment on a section 1983 claim). On this record, the court concludes that it does not. See, e.g., Foreman v. Bureau of Prisons, No. 06-1274, 2007 WL 108457, at \*4 (3d Cir. Jan. 16, 2007) (per curiam) (unpublished); Morales v. Fischer, No. 13-CV-6134 EAW, 2014 WL 4705108, at \*12 (W.D.N.Y. Sept. 22, 2014), appeal filed, No. 14-3881 (2d Cir. Oct. 16, 2014); Escobar v. Garraghty, No. Civ. A. 2:02CV132, 2002 WL 31953499, at \*2–3 (E.D. Va. Apr. 10, 2002) (unpublished), aff'd, 37 F. App'x 674 (4th Cir. 2002) (per curiam) (unpublished). In so holding, the court notes that plaintiffs do not argue that they have ever suffered any adverse medical condition as a direct result of not having an ASL interpreter for medical examinations. See Foreman, 2007 WL 108457, at \*4; Franklin v. District of Columbia, 163 F.3d 625, 636–37 (D.C. Cir. 1998).[10] Therefore, plaintiffs have failed to show that defendants were deliberately indifferent to a serious medical need, and the court grants summary judgment to defendants on count four of the amended complaint, and denies plaintiffs' motion for partial summary judgment on count four.

D.

Count seven asserts that defendants violated plaintiffs' Fifth Amendment right to a reasonably safe environment by failing to "provide adequate visual alarms, pagers, or message boards that would alert Plaintiffs to an emergency." Am. Compl. ¶ 130. Plaintiffs enjoy a constitutional right to "reasonable conditions of safety," which is something "less than absolute safety." Youngberg, 457 U.S. at 321–22; see Hydrick v. Hunter, 500 F.3d 978, 994, 998 (9th Cir. 2007) (analyzing a class of detainees' claim of failure to protect under standard "applicable to

---

[10] Heyer's April 2013 CT scan and May 2013 seizure do not create a genuine issue of material fact on count six. Notably, plaintiffs have not provided expert testimony concerning the events, and the events do not indicate a systemic deficiency in Heyer's medical care.

23

Case 5:11-ct-03118-D   Document 142   Filed 03/31/15   Page 23 of 28

prisoners under the Eighth Amendment"), vacated and remanded on other grounds, 556 U.S. 1256 (2009), reinstated in relevant part, 669 F.3d 937, 940–42 (9th Cir. 2012). Thus, defendants "must take reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). However, a prison official will not be liable for a failure to protect an inmate "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. Beyond such actual knowledge, the prison official "must also have recognized that his actions were insufficient to mitigate" the objectively serious condition or risk of harm. Iko, 535 F.3d at 241 (quotation and emphasis omitted).

Plaintiffs seek more safety measures than those defendants have implemented rather than arguing that defendants have failed to provide them with any safety measures at all. Plaintiffs, however, have failed to show that defendants have drawn any inference that they are at substantial risk of serious harm or that the safety accommodations in place have insufficiently mitigated the risk of harm. See, e.g., Foreman, 2007 WL 10847, at *4; Williams v. Ulep, No. 3:06CV730, 2008 WL 5459776, at *6 (E.D. Va. Mar. 17, 2008) (unpublished), aff'd, 283 F. App'x 106 (4th Cir. 2008) (per curiam) (unpublished); Figueroa v. Dean, 425 F. Supp. 2d 448, 456–57 (S.D.N.Y. 2006). Thus, the court grants summary judgment to defendants on count seven.

E.

Count eight asserts that defendants violated plaintiffs' "First Amendment rights of freedom of speech by failing to provide them with telecommunication equipment necessary for them to communicate with family and friends outside of FCI Butner." Am. Compl. ¶ 135. The court analyzes the claim under Turner v. Safley, 482 U.S. 78, 89–91 (1987). See Lane v. Williams, 689

24

F.3d 879, 883–84 (7th Cir. 2012), Rivera v. Rogers, 224 F. App'x 148, 150–51 (3d Cir. 2007) (per curiam) (unpublished). Under Turner, the court must balance four factors to determine the reasonableness of a prison regulation that allegedly abridges an inmate's First Amendment rights, namely:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (alteration in original, citations and quotations omitted); Turner, 482 U.S. at 89–91; see Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001).

In analyzing the Turner factors, the court accords "substantial deference" to the professional judgment of prison administrators, "who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003); see Youngberg, 457 U.S. at 321–22; Bell v. Wolfish, 441 U.S. 520, 547–48 (1979); Rivera, 224 F. App'x at 150. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the [detainee] to disprove it." Overton, 539 U.S. at 132; see LaSure v. Gore, No. 9:08-CV-0320-RBH-BM, 2009 WL 1748718, at *8 n.5 (D.S.C. June 19, 2009) (unpublished).

As with count seven, plaintiffs seek a different means of exercising their First Amendment rights rather than demonstrating that they have been completely denied any exercise of such rights. Simply put, plaintiffs have not demonstrated a First Amendment violation. See, e.g., Lane, 689 F.3d at 884; Oliver v. Wolfenbarger, No. 07-12672, 2010 WL 148661, at *9–10 (E.D. Mich. Jan. 12, 2010) (unpublished). Although plaintiffs assert that their "access to the TTY device is consistently

25

delayed or restricted," Pls.' Resp. Opp'n Defs.' Mot. Summ. J. [D.E. 124] 42, they have demonstrated at most isolated instances of being unable to use the TTY immediately upon their request. Compare Pls.' Ex. EE [D.E. 124-30] (notes indicating four days when requests to use the TTY were rejected), with Pls.' Ex. FF [D.E. 122-4] (TTY phone log). Such isolated incidents do not violate the Constitution. See Doyle v. Clark, No. 1:09-CV-1150, 2010 WL 2540740, at *2 (W.D. Mich. June 15, 2010) (unpublished); see, e.g., Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003); Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983); Pearson v. Simms, 345 F. Supp. 2d 515, 519–20 (D. Md. 2003), aff'd, 88 F. App'x 639 (4th Cir. 2004) (per curiam) (unpublished). Moreover, defendants have presented persuasive evidence regarding how access limitations to the TTY devices are necessary in light of the unsecured nature of the TTY connection and legitimate institutional interests, and plaintiffs have failed to raise a genuine issue of material fact concerning the validity of the regulation. Plaintiffs have demonstrated that Butner could implement videophone technology. See Pls.' Resp. Opp'n Defs.' Mot. Summ. J. [D.E. 124] 46–48. Nonetheless, all four Turner factors weigh in defendants' favor. See, e.g., Douglas v. Gusman, 567 F. Supp. 2d 877, 886–87 (E.D. La. 2008). Accordingly, the court grants summary judgment to defendants and denies plaintiffs' motion for partial summary judgment on count eight.

F.

Counts nine and ten assert that, in failing to provide ASL translators for religious services, defendants have burdened plaintiffs' exercise of religion in violation of the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq. ("RFRA"), and the First Amendment. Am. Compl. ¶¶ 141–154. Heyer asserts that he does not attend religious services at Butner "because there's no interpreter." Heyer Dep. [D.E. 124-9] 14 (deposition page 104). Boyd asserts that he "consistently attended religious services at prior corrections institutions where a volunteer

26

interpreter" was provided. Am. Compl. ¶ 64. Defendants contend that neither plaintiff has requested an interpreter for religious services.

Although there is an issue of fact concerning whether plaintiffs requested interpreter services or whether the lack of an interpreter has burdened plaintiffs' exercise of religion, the court need not resolve that dispute. When a prisoner is no longer subject to the alleged unconstitutional condition, claims for injunctive and declaratory relief are moot. See, e.g., Rendelman v. Rouse, 569 F.3d 182, 186–87 (4th Cir. 2009); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (per curiam). Of course, in cases where defendants voluntarily discontinue challenged activities in order to render the challenge moot, they must satisfactorily demonstrate (1) that there is "no reasonable expectation" the alleged violation will recur; and (2) that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quotation omitted).

Here, defendants' unequivocally state that plaintiffs will be provided, upon request, with a qualified interpreter for religious ceremonies and programs. See McLaughlin Decl. [D.E. 112-12] ¶¶ 8–9; Defs.' Mem. Supp. Mot. Summ. J. [D.E. 112] 61. Thus, there is no reasonable expectation that the alleged violation will recur and defendants' solution will "completely and irrevocably" eradicate any burden the lack of interpreters formerly placed on plaintiffs' exercise of religion at FCI Butner. Accordingly, the court dismisses counts nine and ten as moot.

## III.

As for the parties' motions to seal, the court has considered the motions under the governing standard. See, e.g., Doe v. Pub. Citizen, 749 F.3d 246, 272–73 (4th Cir. 2014). The court grants the motions in part, and will keep the requested exhibits [D.E. 122, 130-1 through -14, 131] and all

27

filings in connection with defendants' motion to further evaluate Boyd's hearing [D.E. 134, 137, 139] sealed. The court declines to seal defendants' memorandum in opposition to plaintiffs' motion for partial summary judgment [D.E. 130].

IV.

In sum, the court GRANTS IN PART defendants' motion for summary judgment [D.E. 111], and DENIES plaintiffs' motion for partial summary judgment [D.E. 127]. The court DISMISSES as moot counts nine and ten of the amended complaint. The court DENIES defendants' motion to conduct additional testing on Boyd [D.E. 134]. The court GRANTS the parties' motions for leave to file memoranda in excess of the page limit prescribed by Local Civil Rule 7.2 [D.E. 121, 129], and GRANTS IN PART AND DENIES IN PART the parties' motions to seal [D.E. 123, 132, 135, 138, 140]. This action is DISMISSED. The clerk shall unseal defendants' response in opposition to plaintiffs' motion for partial summary judgment [D.E. 130] and shall close the case.

SO ORDERED. This **31** day of March 2015.

JAMES C. DEVER III
Chief United States District Judge