IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CT-2118-D

THOMAS HEYER,                        )
                                     )
            Plaintiff,               )
                                     )      DEFENDANTS' PROPOSED
            v.                       )      FINDINGS OF FACT AND
                                     )      CONCLUSIONS OF LAW
UNITED STATES BUREAU OF              )
PRISONS, et al.,                     )
                                     )
            Defendants.              )


    Defendants, by and through the United States Attorney for the
Eastern District of North Carolina, hereby submit these Proposed
Findings of Fact and Conclusions of Law in accordance with E.D.N.C.
Local Civil Rule 52.1.

                         INTRODUCTION

    Plaintiff, Thomas Heyer (hereafter "Plaintiff" or "Heyer"), is
a federal inmate civilly committed to the custody of the Attorney
General as a "sexually dangerous person" under 18 U.S.C. § 4248.  In
his amended complaint, Plaintiff seeks injunctive relief and
declaratory judgment against the Federal Bureau of Prisons and
several agency officials in their official capacities (collectively
"Defendants" or "BOP") for alleged violations of the Constitution
and the Religious Freedom Restoration Act ("RFRA") related to certain
accommodations for Plaintiff's hearing impairment.  Defendants

1

propose the following findings of fact and conclusions of law:

<u>PROPOSED FINDINGS OF FACT</u>

**Jurisdictional and Procedural Facts**

1.  All parties have been properly designated.

2.  All parties are properly before the Court.

3.  There is no question as to misjoinder or non-joinder of parties.

4.  The Court has jurisdiction over the parties.

5.  Plaintiff is federal inmate Thomas Heyer ("Heyer"). Heyer is represented by Ian Hoffman, David Bergman, Carolyn Pierce, Snayha Nath, and Tara Williamson of the law firm of Arnold & Porter Kaye Scholer LLP; Phil Fornaci of the Washington Lawyers Committee for Civil Rights and Urban Affairs; and Neil A. Riemann of the law firm of Penry Riemann PLLC.

6.  Defendants are the Federal Bureau of Prisons ("BOP") and several BOP officials in their official capacities. BOP is represented by the United States Attorney's Office for the Eastern District of North Carolina through Special Assistant United States Attorneys Robert Dodson, Michael Bredenberg, and Christina Kelley, and Assistant United States Attorney Norman Acker.

7.  Copies of all official documents are kept in the ordinary course of business by BOP. The testimony of the custodian is not necessary for their admission at trial, if otherwise admissible.

2

8.  Heyer is a deaf inmate committed as a sexually dangerous person in the custody of the Attorney General, through the BOP, and is housed at the Federal Correctional Institution located in Butner, North Carolina ("FCI Butner").

9.  Plaintiff initiated this action on June 20, 2011, and subsequently filed an Amended Complaint on April 11, 2012, alleging that Defendants violated the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 et seq. ("RA"); the First and Fifth Amendments of the United States Constitution; and RFRA. See D.E. 1, 24.

10. On March 11, 2013, this Court dismissed, without prejudice, the Rehabilitation Act claim for failure to exhaust administrative remedies under 28 C.F.R. § 39.170 (count I), and the Fifth Amendment due process claim to privacy in medical treatment for failure to state a claim (count V). D.E. 46. The parties subsequently engaged in substantial discovery with regard to the surviving counts.

11. On March 31, 2015, after the submission of dispositive motions by both parties, the district court entered an order granting Defendants' motion for summary judgment. D.E. 142.

12. Plaintiff appealed, and the Fourth Circuit held that Plaintiff provided sufficient evidence to preclude summary judgment in favor of Defendants. D.E. 144, 152. As such, on February 23,

3

2017, the Fourth Circuit vacated the district court judgment and remanded the case to the district court for trial as to the following claims: (1) Heyer's medical treatment (counts IV and VI); (2) safe environment (count VII); and (3) videophone and TTY-related claims (counts VIII). D.E. 152.

13. The Fourth Circuit further remanded the following claims so that the district court "may re-evaluate the merits of these claims in light of the evidence presented by the parties . . . ": (1) Fifth Amendment Due Process Claim related to the Commitment and Treatment Program ("CTP") (count II); (2) RFRA claim (count IX); and (3) First Amendment Free Exercise of Religion (count X). D.E. 152.

14. The Fourth Circuit affirmed this Court's dismissal of the Fifth Amendment Due Process Claim related to disciplinary proceedings (count III) because Plaintiff did not challenge it on appeal. D.E. 152.

15. On May 18, 2017, with the parties' agreement, the Court referred the case for voluntary court-hosted settlement conference. D.E. 161. The parties were unable to reach an agreement and the case is to proceed to trial on November 6, 2017. D.E. 165.

16. On November 2, 2017, the parties entered into a partial settlement agreement resolving all of the above claims, except with regard to count VIII concerning Heyer's First Amendment

4

rights, particularly his access to a videophone.

## Heyer's Sexual Criminal History

17.  In 1987, Heyer was charged with aggravated sexual assault, sexual assault, endangering the welfare of a child, and terroristic threat.  Def. Tr. Ex. 1 (Forensic Evaluation, March 14, 2011, at Def 7530).  He pleaded guilty to the last count and was sentenced to an indeterminate term in a state hospital. Def. Tr. Ex. 1, at 7530.  Heyer's account of the events included sexually assaulting an eight- or nine-year-old boy and engaging in an altercation with the boy's father.  Def. Tr. Ex. 1, at Def 7530.

18.  In 1993, Heyer was indicted on charges of kidnapping, criminal restraint, unlawful possession of a weapon, and endangering the welfare of a child.  He later pleaded guilty to kidnapping and was sentenced to 10 years incarceration.  Def. Tr. Ex. 1, at Def 7530.  The Presentence Investigation Report ("PSR") indicates that Heyer kidnapped a 10-year-old boy, tied him up, and buried him under some rubble.  Def. Tr. Ex. 1, at Def 7531. However, Heyer later disclosed that he also sexually assaulted the boy before burying him.  Def. Tr. Ex. 1, at Def 7531-32.

19.  In March 2003, Heyer was convicted of possession of child pornography by the United States District Court for the Eastern District of Tennessee, for which he was sentenced to 60 months

5

imprisonment and 3 years of supervised release. Def. Tr. Ex. 1, at Def 7521 and 7532.

20. Reports indicate that during the child pornography investigation, FBI investigators interviewed a 15-year-old hearing-impaired male who indicated that when he was 13 or 14 years old, Heyer gave him drugs and showed him child pornography. Def. Tr. Ex. 1, at Def 7533. During BOP's Precertification Evaluation, Heyer described the boy as the son of an ex-girlfriend. Def. Tr. Ex. 1, at Def 7533.

21. In September 2007, after his release from incarceration, Heyer violated the terms of his supervised release and, consequently, was sentenced to 18 months imprisonment. Def. Tr. Ex. 1, at Def 7533.

**Heyer's Civil Commitment**

22. On December 18, 2008, while Heyer was serving his supervised release violation sentence, the government initiated civil commitment proceedings against Heyer. Def. Tr. Ex. 2 (Civil Commitment Order), at 7540. After subsequent litigation involving the constitutionality of the Adam Walsh Act, an evidentiary hearing was held on the government's civil commitment petition on May 30 and 31, 2012. Def. Tr. Ex. 2 (Civil Commitment Order), at 7540.

23. In July 2009, Plaintiff was found to possess a 109-page

6

handwritten manuscript of a child pornography book, which was located during a routine cell search. Def. Tr. Ex. 1, at 7527; Def. Tr. Ex. 2, at 7544-45. In addition, Heyer has had incoming mail rejected twice. On August 26, 2010, mail was recommended rejected due to text describing victimization, abuse, or humiliation of children or adults; sexually violent activity; and text that might encourage criminal activity. On January 6, 2011, Heyer's mail was again rejected for the same reasons. Def. Tr. Ex. 1, at 7527.

24. On July 9, 2012, Heyer was civilly committed as a sexually dangerous person pursuant to 18 U.S.C. § 4248. Def. Tr. Ex. 2 (Civil Commitment Order), at 7547. Judge Boyle noted one of the experts described Heyer has having "poor sexual self-regulation, poor cooperation with supervision in the community, and impulsive behavior." Def. Tr. Ex. 2, at 7544. As a result, Judge Boyle found that Heyer would have "serious difficulty in refraining from sexually violent conduct or child molestation." Def. Tr. Ex. 2, at 7545. Heyer is not currently participating in sex offender treatment.

### Respondent's Ability to Communicate

25. During his civil commitment at FCI Butner, Heyer has submitted several handwritten "Inmate Requests to Staff," commonly referred to as "cop-outs," which either he wrote himself, or

he communicated to another person who wrote the request. Def.
Tr. Ex. 23 (Heyer's Inmate Requests to Staff.

26. Many of those cop-outs Heyer wrote himself and his message was
    communicated clearly. For instance, on March 24, 2017, Heyer
    wrote a cop-out to Dr. Kohr at FCI Butner, stating: "I want back
    in program CTP. Right now. I need interpreter with me talk
    to you. I will discuss with you. Okay. I accept (sic) want
    back in program. I want change my life." Def. Tr. Ex. 23, at
    Def_7154.

27. As early as May 29, 2009, Heyer wrote a cop-out indicating he
    wanted a job: "Please add me to the main for work detail." Def.
    Tr. Ex. 23, at Def_995.

28. Heyer has also submitted electronic TRULINCS cop-outs to staff
    by either typing them himself, or conveying the information to
    another person who in turn typed the message. Def. Tr. Ex. 24
    (Heyer's electronic requests to staff). Inmates have a unique
    user ID and password assigned to them to access the TRULINCS
    electronic cop-out system.

29. For example, on August 23, 2017, Heyer wrote an electronic
    cop-out to staff regarding a disciplinary incident: "Mr.
    Slaydon, I am sorry for lying to you. I did argue with Doug.
    It was stupid like every time we argue and childish by both of
    us. I got angry and frustrated . . . I don't have a problem

8

with doug at all he is my friend and brother." Def. Tr. Ex. 24, at Def 8035.

30. Heyer also utilizes the TRULINCS system to send emails to individuals outside of the prison. Def. Tr. Ex. 25 (Heyer's TRULINCS emails).

31. For example, on September 18, 2017, Heyer wrote an email to a woman named "Brenda," whom he refers to as his adopted mom. He writes: "Brenda, How are you? What up? You are okay? You son did talk to me. Your son told me [] you went to the camp. Your grandchild went to around playing your house all the time. Ok you have fun time for your grandchild . . . good night good bye I will see you later. I will check on e-mail ok." Def. Tr. Ex. 25, at Def 7922.

32. Heyer sent approximately 30 TRULINCS emails to "Brenda" and George Heyer, among others, on various dates. Def. Tr. Ex. 25.

33. Heyer has also taken advantage of letter-writing while at FCI Butner to write his brother, George Heyer. For example, on December 7, 2014, Heyer either wrote or had someone write a letter to George Heyer. Def. Tr. Ex. 28 (Letter from Heyer to George Heyer, at Def 6240-6244.

34. Heyer has also demonstrated his ability to either convey written messages himself, or have someone write a message for him. Heyer has authored a "Personal History of Thomas Heyer", Def.

9

Tr. Ex. 27, as well as an "Autobiography of Thomas Heyer", Def. Tr. Ex. 26.

## BOP's Security Concerns with Videophone

35. Videophone technology allows two deaf individuals to communicate using a direct point-to-point video link whereby they use American Sign Language ("ASL") to communicate.

36. Todd Craig is the BOP's Chief of the Office of Security Technology located at its Central Office in Washington, D.C.

37. Mr. Craig has in depth knowledge of both the Department of Justice's and BOP's information technology ("IT") security technology requirements.

38. Mr. Craig also has knowledge and experience in the field of corrections, having been a former Warden.

39. Mr. Craig expressed BOP's legitimate security concerns with providing Heyer access to a direct point-to-point videophone.

40. No BOP facility is using videophone as a method of communication for deaf inmates.

41. A deaf or hard-of-hearing ("DHH") inmate's use of a videophone with direct video visualization of an outside caller presents many security risks. This direct visualization raises concerns related to: depiction, description, or encouragement of activities that may lead to the use of physical violence or group disruption; depiction or description of procedures for

10

the construction or use of weapons, ammunition, bombs, or incendiary devices; depiction, encouragement, or description of methods of escape from BOP facilities; encouragement, instruction, or facilitation of criminal activity (e.g. the introduction of dangerous contraband); unauthorized direction of an inmate's business; use of threats, extortion, or obscenities; use of code; obstruction of the public's identity through the use of disguises or masks; nudity or sexually explicit material; or depiction or description of procedures for the manufacture of alcoholic beverages or drugs.

42. The direct video contact between the DHH inmate and the outside caller may allow any of this information to be transmitted not only through ASL but also through other visual means such as writings, drawings, or other information displayed by either caller. This information might be displayed prominently by being held up to the camera or in a less conspicuous manner in the background of the video.

43. Additionally, there are several security concerns with regard to providing Heyer, specifically, with a videophone due to his status as a sexually dangerous person with a history of prior sex offenses against children, including child pornography.

44. During a point-to-point videophone communication, a child or photograph(s) of children could be displayed to Heyer by the

11

outside caller. Heyer has a history of sexual gratification and arousal by being presented with images of children. Any act by an outside caller to exploit a child, no matter how slight or how fast the interaction occurs, has the potential for significant harm to child which would have occurred on a telecommunication method provided for by BOP. Also, this type of incident could be detrimental or counterproductive for Heyer's sex offender treatment as it pertains to sexually offending against children.

45. An additional security concern is the ability of a point-to-point videophone call between an inmate inside a BOP facility, to an outside call recipient who is using a mobile device, and who could be positioned just outside of the prison transmitting real-time video footage to the inmate of staff and security procedures.

46. Furthermore, other inmates who do not have access to the videophone may attempt to inflict pressure on, or use violence as a means to force the inmate with access, to use the direct video link to commit nefarious criminal activity. Additionally, the inmate with access could attempt to sell his access to other inmates, which would be a security concern because such activity has the potential to fuel criminal activity within the prison.

12

47. The Warden of FCI Butner is Andrew Mansukhani. Warden Mansukhani has over twenty years of correctional experience, having served in various capacities in federal prisons nationwide.

48. Warden Mansukhani concurs with the security concerns noted above. He further explained that the inmate population of the housing unit where Heyer lives – and where any potential videophone would be installed – is filled with inmates who may attempt to take advantage of Heyer's access to a technology that provides a video link to the outside world, where they do not have such access. All of the inmates housed in Heyer's unit have either been civilly committed as sexually dangerous persons, or are being detained pending a hearing to determine if they meet criteria for commitment. As such, much of the inmate population in the CTP, including Heyer, has a history of manipulative behaviors as it relates to their sexual offending, which increases the risk that that videophone could be misused.

49. Dr. Brian Grover, CTP Administrator, testified consistent with the record evidence, that Heyer is civilly committed as a sexually dangerous person, which presents its own inherent security risks over and above that of a non-sex offender. Dr. Grover highlighted to the Court Heyer's past offenses, which

13

have included both hands-on offenses against children, as well as a history of possessing child pornography while in the community.

50. Additionally, the evidence demonstrated that Heyer has a history of possessing nude photographs of young boys while in BOP custody. Given Heyer's sex offense history against children, Dr. Grover testified that BOP is especially concerned with Heyer having a direct point-to-point video link with an individual in the community.

**Video Relay Service**

51. FCI Butner is in the process of procuring a contract for the provision of Video Relay Service (VRS), which will be made available to Plaintiff. Upon execution of the contract for VRS services, the VRS system will be installed and operational within thirty (30) days. Def. Tr. Ex. 19 (Video Relay Services Installation and Maintenance Statement of Work, at 9616.

52. The VRS system will be separate and apart from BOP's existing IT infrastructure. Def. Tr. Ex. 19, at 9611. The system includes inmate VRS kiosk, as well as terminals in the institution's Unit Management and Special Investigative Supervisor's offices for the purpose of recording and monitoring all calls made through the system. Def. Tr. Ex. 19, at 9611.

14

53. Each call placed through the VRS system is tracked by BOP by way of a log, and all calls are recorded and digitally stored.

54. VRS will provide accessibility between Heyer and hearing people by allowing him to communicate with hearing people who use a regular telephone. The VRS system will allow Heyer to communicate using only American Sign Language (ASL) with an approved ASL interpreter. The approved ASL interpreter will then communicate directly with the hearing VRS recipient by telephone. Def. Tr. Ex. 19, at 9611.

55. The ASL interpreter must communicate directly with the hearing VRS recipient by telephone, and no direct video communication will be permitted between Heyer and the VRS call recipient via any VRS video link. At no time will Heyer be able to see or communicate directly with the call recipient. Def. Tr. Ex. 19, at 9611.

56. VRS does not provide for a means of communication between two deaf or hard of hearing individuals, both of whom require the use of ASL.

57. However, BOP provides DHH inmates with several other methods of communication with individuals outside the prison by way of a teletypewriter ("TTY"), letter writing, email, and in-person visiting.

58. Once the VRS system is operational, Heyer will have access to the VRS system in a manner substantially similar to the access hearing inmates have to the BOP's inmate telephone system. The inmate VRS kiosk will be mounted to a wall in a hallway directly outside of Plaintiff's Unit Team's office. Heyer will be able to make calls using the VRS system in a manner that affords him a reasonable amount of privacy, while also providing staff with an ability to maintain visual observation of Heyer.

59. Similar to traditional inmate telephone privileges, all phone numbers Heyer wishes to contact through the VRS system must be approved by his Unit Team prior to being added to the VRS system. Calls to unapproved phone numbers will be prohibited. Heyer will typically have access to the VRS system seven days per week, during the hours of 6:00 a.m. EST through 10:00 p.m. EST. He will be able to utilize the system for a total of 300 minutes per month, with the time limit increasing to 400 minutes per month during the months of November and December. Each call will be limited to thirty (30) minutes per session. Def. Tr. Ex. 19, at 9611.

60. When a VRS call is placed, the BOP will have access to the full communication between Plaintiff and the call recipient. In a manner identical to BOP's ability to review inmate telephone calls, BOP will have the ability to monitor VRS calls as they

16

occur in real-time, or the recordings may be reviewed at a later time. In either case, BOP will have ready access to the full communication, without the need for interpretation of the ASL used during the call. The real-time monitoring, as well as the recording, will not only show the ASL used by Heyer and the ASL interpreter, but the live call and recording will also include the audio portion of the conversation that takes place between the interpreter and the recipient of the call.

61. In addition to in-person visitation, email, and written letters, the current TTY system provides Heyer with a means to communicate with other DHH individuals outside of FCI Butner.

62. Heyer's immediate family members are not fluent in ASL. Def. Tr. Ex. 33 (Heyer Deposition, at 22). Heyer primarily communicates with his immediate family members by way of written letters and email. He has occasionally used the TTY system to communicate with his brother. Def. Tr. Ex. 33, at 153.

63. Aside from written communications, Heyer communicates with his immediate family members using very basic signs, finger-spelling, signaling pointing and gestures. Def. Tr. Ex. 33, at 23.

64. Once operational, the VRS system will provide Heyer with a greater ability to communicate with his immediate family members. Through the VRS system, both Heyer and his immediate

17

family members will be able to communicate in each party's preferred language. Heyer will be able to communicate via ASL, while his family members will be able to communicate verbally, thereby ensuring each party's messages are understood and conveyed accurately.

65. Heyer's mother is unable to read, and thus, VRS will provide Plaintiff with a means for direct communication with his mother, which was not available in the past. Def. Tr. Ex. 33, at 23.

66. The security concerns involving the use of a videophone are different from the security concerns involving VRS because of the nature of the contact between the DHH inmate and the outside caller. With the use of a VRS, the two parties to the call communicate through a Video Interpreter ("VI"). The VRS configuration utilized by the BOP is intended for use by a DHH inmate to contact hearing individuals who are using telephones; the DHH inmate communicates with the outside, hearing call recipient through the VI and never sees the call recipient. This results in both sides of the telephone conversation being verbalized. When the DHH inmate signs to the VI, the VI verbalizes the message for the outside caller. When the hearing call recipient responds, he verbalizes his response to the VI (who then signs the message to the DHH inmate). When both sides of the conversation are verbalized, BOP staff are

able to monitor the call in live time and terminate the call if necessary.

67. With the use of a videophone, both parties to the call have direct visual contact with one another, providing the parties with an opportunity to exchange information through real-time visual means alone. This increases the risk of coded information being exchanged through writings, drawings, or information displayed in the background. An ASL interpreter who translates a recorded call between a DHH inmate and an outside call recipient may not be aware of the significance of these other visual cues in conjunction with the conversation between the parties to the call.

68. The BOP does not have the unilateral authority to install a videophone for use by Heyer or any other DHH inmate. The technical specifications for point-to-point videophone access prevent it from being integrated into the existing inmate telephone system and do not conform to Department of Justice ("DOJ") information technology requirements.

69. Although BOP currently has a waiver from DOJ to allow for the installation of the necessary digital subscriber line (DSL) for the VRS and Video Remote Interpreting equipment, the terms of the waiver approved by DOJ for the installation of VRS within BOP institutions is limited to video visual contact for the

19

purposes of sign language interpretation services only, such would occur during the course of a VRS call or through the use of Video Remote Interpreting ("VRI") services. VRI services provide interpreter services that allow a DHH inmate to communicate through ASL directly with BOP staff. The DOJ waiver is not approved for direct video point-to-point contact.

## Teletypewriter (TTY)

70. FCI Butner provides TTY devices to DHH inmates for their use in making telephone calls. There are currently two TTY devices available for Heyer's use.

71. There is one TTY device located in the office of a Maryland Housing Unit Team member, and a second TTY device available for use within FCI Butner.

72. Maryland Unit Team staff have been trained on the use of the TTY device. In the event that one of the four Unit Team members in the Maryland Unit is not available to provide a TTY call, additional staff at FCI Butner have been trained on how to operate the device, including the various Lieutenants, the two Chaplains assigned to FCI Butner, and all other unit team members located at FCI Butner.

73. The TTY device is available for Heyer's use, on Mondays through Fridays, from 7:30 a.m. to 4:00 p.m., upon request. On weekdays, Heyer will be allowed access to the TTY on the same

20

day of the request, absent exigent circumstances.

74. The TTY device is also available on two evenings each week, during which time members of the Unit Team work at least one evening shift and can monitor the call. On these evenings, Heyer is able to use the TTY until approximately 9:00 p.m.

75. For weekend use when Maryland Unit Team members may not be scheduled to work, Heyer may request a weekend TTY call by providing notice of his request no later than 10:00 am on the Friday preceding the weekend. Institution staff will then take reasonable efforts to accommodate his request.

76. BOP has implemented practices to ensure DHH inmates have meaningful access to a TTY device, to include training additional staff on operating the TTY. Also, although non-deaf inmates are limited to 15 minutes for a phone call, Heyer is routinely allowed to exceed this maximum time limit when using the TTY.

## CONCLUSIONS OF LAW

1. Jurisdiction and venue are proper in this court. All parties have been correctly designated and are properly before this court.

2. Heyer's remaining claim regarding BOP's decision to limit his access to a videophone should be analyzed under <u>Turner v. Safely</u>, 482 U.S. 78, 89-91 (1987).

21

3.  Before engaging in <u>Turner</u>'s four-factor analysis, however, the court must determine whether the challenged policy or procedure actually "impinges" on the inmate's constitutional rights. <u>See id.</u>; <u>Lane v. Williams</u>, 689 F.3d 879, 884 (7th Cir. 2012); <u>Jehovah v. Clarke</u>, 798 F.3d 169, 179-80 (4th Cir. 2015).

4.  "The burden . . . is not on the [Defendants] to prove the validity of prison regulations but on the prisoner to disprove it." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003).

5.  If the court finds that the challenged policy does impinge on Heyer's First Amendment right, the court engages in a four factor analysis. <u>Turner</u>, 482 U.S. 89-90.

6.  The four <u>Turner</u> factors the Court must consider are : (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there was an absence of ready alternatives to the regulation in question. <u>Id.</u>

7.  As the Court in <u>Turner</u> explained, this is not a "'least restrictive alternative' test" which requires prison officials

22

"to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. (internal citation omitted).

8.  In analyzing the Turner factors, the court accords "substantial deference" to the professional judgment of prison administrators, "who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton v. Bazzetta, 539 U.S. 126, 132 (2003); see Youngberg, 457 U.S. at 321-22; Bell v. Wolfish, 441 U.S. 520, 547-48 (1979).

9.  Prison administrators must strike a "delicate balance" "between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment, in person or through the written word." Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

10. While certain claims to prison access are undoubtedly legitimate, "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." Id.

11. As such, the courts must afford "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the

23

outside world." Id. at 407-408.

12. BOP has a legitimate interest in monitoring all inmate telecommunications to preserve the security and orderly management of the institution and to protect the public. See 28 C.F.R. § 540.102; Altizer v. Deeds, 191 F.3d 540, 549 (4th Cir. 1999) (recognizing a substantial governmental interest in censoring certain materials from an inmate's outgoing mail if such materials were "detrimental to the security, good order, and discipline of the institution, or dangerous to the public").

13. There are currently no ready alternatives to suggest that the BOP's decision not to provide point-to-point communication via videophones is an "exaggerated response" to the BOP's expressed concerns. See Turner, 482 U.S. at 90-91.

14. Plaintiff has demonstrated the ability to communicate in written English, or he has communicated to others his intended message, which is then written in English.

15. Heyer admits he has used the inmate email system to communicate with family, friends, and attorneys. Def. Tr. Ex. 25; Def. Tr. Ex. 33 (Heyer Deposition, at 165).

16. Heyer has used the written Inmate Requests to Staff, also known as "cop-outs" to communicate with BOP staff. Def. Tr. Ex. 23.

17. Heyer has utilized electronic cop-outs to communicate with BOP staff. Def. Tr. Ex. 24.

24

18. Heyer has utilized BOP's Administrative Remedy Program in written English, either by his own writing or by communicating his intended message to others who have conveyed the message in written English.

19. As a part of the CTP, Heyer has completed written treatment assignments, including autobiographies, either by his own writing or by communicating his intended message to others who have conveyed the message in written English. Def. Tr. Ex. 26 and 27.

20. On appeal, the Fourth Circuit in this case found that BOP's TTY-only policy impinges on Heyer's First Amendment right to communicate with those outside the prison. See Heyer v. United States Bureau of Prisons, 849 F.3d 202, 214 (4th Cir. 2016). However, on remand the evidence at trial demonstrated that BOP does not, in fact, have a TTY-only policy, and that Heyer can effectively communicate with hearing individuals outside of the prison environment using the following methods of communication: TTY, letter writing, inmate TRULINCS email system, and in-person visiting. Heyer failed to overcome BOP's evidence that Heyer, in fact, utilized nearly all of these methods to communicate with family and friends outside of FCI Butner.

21. Additionally, BOP presented evidence to this Court to establish

25

that FCI Butner is in the process of implementing VRS as an additional method of communication with individuals outside of the prison.  Specifically, BOP has entered into a contract with a VRS provider and the necessary equipment is in the process of being installed.  Once operational, Heyer will have the ability to communicate in his native ASL, with hearing individuals outside of the prison with the assistance of an ASL interpreter.

22. The evidence also demonstrated that Heyer will have the ability to use the VRS in substantially the same manner in which hearing inmates have access to the telephone.

23. Although the Court recognizes that VRS does not give Heyer the ability to communicate with other deaf individuals in the community, the Court finds that Heyer failed to establish a First Amendment violation in that regard, as he has not identified any deaf person with whom he would communicate with using a videophone.  Even if he did, the other alternative means of communication afford Heyer constitutionally adequate means of communication with deaf individuals outside of the prison.

24. Therefore, the Court holds that BOP's policies with regard to providing VRS, TTY, emails, letter writing, and in-person visiting do not impinge on Heyer's First Amendment rights.

25. Even, assuming Heyer is able to establish that BOP's current

policies impinge on his First Amendment rights, the Court must determine whether that policy "is reasonably related to legitimate penological interest," as required by Turner.  482 U.S. at 89.

26.  Under Turner, the Court must balance four factors to determine the reasonableness of a prison regulation that allegedly abridges an inmate's First Amendment rights, namely:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it?  Second, are there alternative means of exercising the right that remain open to prison inmates?  Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally?  And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006)(alteration in original, citations and quotations omitted); Turner, 482 U.S. at 89-91; see Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001).

27.  The Court first considers whether there is a "valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it.  Turner, 482 U.S. 89-90 (internal quotation marks omitted).

28.  "There is no doubt that BOP has a legitimate interest in

27

maintaining the security of its facilities and in protecting the public from further criminal activity." Heyer, 849 F.3d at 215.

29. On appeal, the Fourth Circuit "recognize[d] that a videophone conversation presents certain risks not present with TTY conversations, such as the possibility of a video of the conversation being posted on the Internet or the possibility that an inmate might expose himself to the person on the other end of the conversation." Id. This Court agrees, and additionally finds that at the trial, BOP witnesses presented sufficient evidence of additional legitimate security risks that are present this case.

30. For example, the CTP administrator, Dr. Brian Grover, testified consistent with the record evidence, that Heyer is civilly committed as a sexually dangerous person, which presents its own inherent security risks over and above that of a non-sex offender. Dr. Grover highlighted to the Court Heyer's past offenses, which have included both hands-on offenses against children, as well as a history of possessing child pornography while in the community.

31. Additionally, the evidence demonstrated that Heyer has a history of possessing nude photographs of young boys while in BOP custody. Given Heyer's sex offense history against

28

children, Dr. Grover testified that BOP is especially concerned with Heyer having a direct point-to-point video link with an individual in the community.

32. Furthermore, Warden Mansukhani further explained BOP's legitimate security concern of protecting the public from Heyer's further exploitation of children through the use of internet and video technology, as he has done in the past. The Court agrees. Unlike with the other methods of communication that are available to Heyer, a videophone would allow Heyer to have a direct visual link to an individual in the community, who could use that link for nefarious activity and once that activity is completed, e.g. exposing a child or child pornography to Heyer, the proverbial bell has already rung and the harm to that child will have already occurred.

33. Additionally, the Court heard testimony from BOP's Chief of Office of Security Technology, Todd Craig. Mr. Craig aptly testified with regard to the delay BOP would suffer in having the videophone conversations translated. For instance, should Heyer be allowed access to a videophone, although BOP would have the physical capability to record the conversation, it does not have the ready capability to understand what was said during the conversation, specifically during a conversation between two parties each communicating using ASL. Mr. Craig testified

that it could take up to one week for a conversation in ASL between two deaf individuals to be translated. Mr. Craig testified that BOP has legitimate security concerns with the amount of delay in translation, because should a coded message be passed between the two individuals on the videophone, BOP may have received the translated conversation too late in order to thwart any criminal activity. Mr. Craig also provided other examples during his testimony which satisfies this court that prong 1 of the <u>Turner</u> analysis is met.

34. This Court affords deference to prison officials who are best suited to understand its unique security concerns, and the Court finds that the particular security concerns in relation to Heyer are legitimate and there is a rational connection between BOP's legitimate security concerns, and the decision not to provide a videophone to Heyer. <u>See Turner</u>, 482 U.S. at 89-90.

35. BOP has demonstrated a legitimate interest in monitoring inmate telecommunications to preserve the security and orderly management of the institution and to protect the public. <u>See</u> 28 C.F.R. § 540.102; <u>Altizer v. Deeds</u>, 191 F.3d 540, 549 (4th Cir. 1999) (recognizing a substantial governmental interest in censoring certain materials from an inmate's outgoing mail if such materials were "detrimental to the security, good order, and discipline of the institution, or dangerous to the public").

30

36.  The second <u>Turner</u> factor requires the Court to consider whether Heyer has alternate means of exercising the constitutional right. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." <u>Turner</u>, 482 U.S. at 90 (citation, internal quotation marks, and alteration omitted).

37.  In this case, the Court finds Heyer has several alternative available means of communication, one of which FCI Butner is bound by contract to implement – VRS. The BOP's contract for VRS will allow Heyer to communicate with hearing individuals outside of the prison through the use of a relay interpreter.

38.  At trial, Heyer acknowledged that all of the individuals with whom he regularly contacts are non-deaf individuals who are not fluent in ASL. For example, Heyer admits that his brother and mother do not know conversational ASL. Therefore, the BOP's provision of VRS will allow Heyer to communicate with his brother and mother, for example, in the same manner as non-deaf individuals. The evidence established that Heyer's access to the videophone will be substantially similar as the non-deaf inmate's access to the prison's telephone system.

39.  Under the third <u>Turner</u> factor, the Court must consider the

effect that "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, court should be particularly deferential to the informed discretion of corrections officials." Id.

40. BOP's existing inmate telephone system, and the forthcoming VRS, cannot integrate a point-to-point communication via videophone. Currently, use of point-to-point videophones do not comply with BOP/DOJ IT security requirements, and thus BOP would necessarily have to request a waiver of such requirements, prior to implementing this technology. BOP's current waiver to provide VRI and VRS is limited to video visual contact solely for the purposes of sign language interpretation. Additionally, because point-to-point videophone conversations occur solely in ASL, there is no existing mechanism to have those calls translated from ASL to English and, as such, cannot be live-monitored for substance. BOP would have to contract with outside entities to provide interpretation services, at yet an additional expense.

41. The fourth Turner prong requires the Court to consider whether there are "ready alternatives" to the challenged policy.

Turner, 482 U.S. at 90.

42. Heyer failed to provide sufficient evidence that there are ready alternatives, such that BOP's decision not to provide point-to-point communication via videophone is an "exaggerated response" to prison concerns.  Id. At 90-91.

43. Moreover, to the extent Heyer argues BOP has the ability to provide videophones in the same way as it provides access to the TTY, this suggestion demonstrates the essence of the judiciary being "'ill-equipped' to deal with the difficult and delicate problems of prison management" of which the Supreme Court cautioned in Thornburgh,  490 U.S. at 407-08.

44. Simply put, and as detailed above, point-to-point videophone communications present additional unique security concerns and costs that are not present with TTY or VRS systems.

45. Heyer failed to establish by a preponderance of the evidence that BOP's decision not to provide him access to a videophone constitutes a violation of his First Amendment rights.

46. Accordingly, judgment shall be entered in favor of the BOP and against Heyer.

Respectfully submitted, this 2nd day of November, 2017.

ROBERT J. HIGDON, JR.
United States Attorney

By:  /s/ Robert J. Dodson
ROBERT J. DODSON

33

Special Assistant U.S. Attorney
Civil Division
310 New Bern Avenue, Suite 800
Raleigh, NC  27601-1461
Telephone:  (919) 856-4530
  (919) 575-3900 x 6779
Facsimile:  (919) 856-4821
Email: robert.dodson2@usdoj.gov
N.C. Bar # 41210
Attorney for the Defendants

CERTIFICATE OF SERVICE

This is to certify that I have this 2nd day of November, 2017,

served a copy of the foregoing upon counsel for Respondent, by

electronically filing the same with the Clerk of Court using the

CM/ECF system which will send notification of such filing.

/s/ Robert J. Dodson
ROBERT J. DODSON
Special Assistant U.S. Attorney
Civil Division
310 New Bern Avenue, Suite 800
Raleigh, NC  27601-1461
Telephone:  (919) 856-4530
  (919) 575-3900 x 6779
Facsimile:  (919) 856-4821
Email: robert.dodson2@usdoj.gov
N.C. Bar # 41210
Attorney for the Defendants

34