**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 19-7027**

---

THOMAS HEYER,

Plaintiff - Appellant,

and

ROBERT PAUL BOYD,

Plaintiff,

v.

UNITED STATES BUREAU OF PRISONS; THOMAS R. KANE, in his official capacity as Acting Director of the United States Bureau of Prisons; IKE EICHENLAUB, in his official capacity as Regional Director of the United States Bureau of Prisons Mid-Atlantic Region; WARDEN SARA M. REVELL; WARDEN TRACY W. JOHNS; JEFFREY A. ROSEN,

Defendant – Appellees.

----------------------------------------

STUART GRASSIAN, M.D.; CRAIG HANEY, Ph.D., J.D.; TERRY A. KUPERS, M.D., M.S.P.; PABLO STEWART, M.D.; BRIE WILLIAMS, M.D., M.S.; NATIONAL ASSOCIATION OF THE DEAF,

Amici Supporting Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:11-ct-3118-D)

---

Argued: October 29, 2020 Decided: January 13, 2021

---

Before MOTZ, KEENAN, and FLOYD, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Floyd wrote the opinion in which Judge Motz and Judge Keenan joined.

---

**ARGUED:** Andrew Tutt, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellant. Mallory Brooks Storus, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Ian S. Hoffman, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellant. Robert J. Higdon, Jr., United States Attorney, Joshua B. Royster, Assistant United States Attorney, Michael D. Bredenberg, Special Assistant United States Attorney, Christina A. Kelley, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. Daniel M. Greenfield, Roderick & Solange Macarthur Justice Center, NORTHWESTERN PRITZKER SCHOOL OF LAW, Chicago, Illinois, for Amici Professors and Practitioners of Psychiatry and Psychology. Marc Charmatz, Howard A. Rosenblum, Anna Bitencourt, NATIONAL ASSOCIATION OF THE DEAF, Silver Spring, Maryland, for Amicus National Association of the Deaf.

---

FLOYD, Circuit Judge:

Plaintiff-Appellant Thomas Heyer appeals from a two-day bench trial in the Eastern District of North Carolina. Heyer is a Deaf individual who communicates in American Sign Language (ASL). The issue at trial was whether Defendant-Appellee U.S. Bureau of Prisons (BOP) violated Heyer's First Amendment rights by denying him access to point-to-point videophone calls.[1] The district court entered judgment in favor of BOP. Because we conclude the district court clearly erred in reaching this decision, we reverse.

I.

A.

We begin with a summary of the facts and testimony contained in the full record on appeal, including relevant information on deafness, the Deaf Community, and ASL.[2]

1.

Dr. Thomas Cokely—a sociolinguist and Heyer's expert witness—provided expert testimony and two reports opining on deafness, its effect on literacy, and its consequences

---

[1] Heyer also named BOP and U.S. Department of Justice (DOJ) officials as defendants. Because the substance of his claim does not turn on any distinction between BOP and the named officials, we only refer to BOP as the Appellee.

[2] The National Center on Disability and Journalism recommends using the adjective "deaf" to describe the audiological condition of hearing loss. By contrast, "Deaf" is an adjective used to describe individuals who view themselves as members of the Deaf community. *See Disability Language Style Guide*, Nat'l Ctr. on Disability & Journalism, https://ncdj.org/style-guide/#D (last visited Jan. 12, 2021). While some individuals prefer to describe themselves as "hard of hearing," *see id.*, we use the term d/Deaf individuals.

for incarcerated and confined persons. As Dr. Cokely explained, it is easy to approach deafness as a purely audiological condition, but that understanding is too narrow. Deafness is defined as the inability to "hear *and* understand speech," and it is a uniquely social condition. J.A. 1022. Individuals who are deaf may therefore also view themselves as part of a larger "linguistic and cultural" community—the American Deaf Community. J.A. 1023. Those born deaf or who become deaf early in life face unique barriers to learning English and are more likely than late-deafened individuals to gravitate toward membership in the Deaf community.

According to Dr. Cokely, Deaf individuals "are fundamentally a visual people, with their own visual language, social organizations, history, and mores." J.A. 1023. ASL forms a crucial link between members of this community, because it "is the only means of communication that enables effective, efficient and reliable communication." J.A. 1024. ASL "defines [the Deaf community] as a linguistic minority," J.A. 1023, and "provides a means of determining acceptance into [that] [c]ommunity." J.A. 1025.

Dr. Cokely also provided expert opinions on misconceptions about ASL: ASL is not a visual representation of the English alphabet or English vocabulary. It is an entirely separate language with its own syntax and grammar that he described as "closer to Chinese than English." J.A. 132. ASL users communicate in three dimensions and make use of hand shapes, movements, locations, and palm orientations paired with "non-manual behavior[s]"—for instance, wrinkling one's nose—to "indicate grammatical functions." J.A. 133–34. Unlike English, ASL has no generally accepted written form.

Dr. Cokely further explained that any competence Deaf individuals achieve in English usually extends only to written English. And Deaf individuals are not similarly situated to other foreign-language speakers when it comes to learning written English. Most Deaf individuals have "limited language exposure in early childhood" and "grow up in a linguistically impoverished and deprived environment," making acquisition of English skills more difficult. J.A. 1027–28. As a result, most Deaf high-school graduates communicate in written English at the third-grade level. Dr. Cokely therefore opined that Deaf individuals often achieve, at best, "'survival' English" skills that enable them to engage with simple, written English in repetitive and predictable contexts they already understand. J.A. 1028. This level of literacy permits Deaf individuals to navigate their daily lives by reading, for instance, directions, street signs, and "other basic printed material." J.A. 1028–29. However, Dr. Cokely asserted that when Deaf individuals write messages to others, those writings are often misunderstood.

2.

Because deaf persons cannot make telephone calls, they require a substitute. Before the advent of videophones, deaf individuals used the teletypewriter (TTY)—essentially a keyboard connected to an analog phone line that permits users to type messages back and forth. Importantly, TTY requires users to have some fluency in written English.[3] Deaf

[3] Heyer's communication technology expert also testified that few people still use these devices, and he expects TTY to become obsolete in the next three-to-four years. This expert also opined that the functionality of TTY is limited. For instance, communication

individuals today increasingly use videophones, which operate like a standard smartphone and have both a screen and camera permitting the use of ASL instead of English. Videophone users can make two types of calls: one between a deaf and non-deaf individual and a second between two deaf individuals. The first, Video Relay Service (VRS), permits a deaf individual to communicate with non-ASL speakers. The deaf participant calls an interpreter who in turn calls the hearing participant and then translates back and forth. The deaf and hearing participants are not directly connected.

VRS calls are not supported between two deaf participants. Therefore, deaf individuals make point-to-point video calls to communicate with each other. These calls—which essentially resemble a Skype call—allow the two participants to sign directly to each other. For deaf individuals, point-to-point calls are the closest analogue to a telephone call. As the National Association for the Deaf ("NAD") explained in its amicus briefing: "[W]here telephones can convey important linguistic information such as emotion, tone, or inflection, which can affect meaning and message significantly, videophones [but not TTY] can also do so . . . ." Br. of Amicus Curiae NAD at 10.

3.

Dr. Cokely also opined that Deaf individuals face unique risks associated with incarceration and detention because the inability to have typical interactions in one's

---

on a TTY is not fluid because it does not allow participants to "talk simultaneously to one another" or to "interrupt one another." J.A. 194.

primary language has been shown to reduce fluency. When isolated from other ASL speakers, Deaf prisoners lack other persons with whom they can "communicate freely and fluently [or] have a free and easy exchange of ideas." *See* J.A. 1043. Dr. Cokely therefore believes that Deaf prisoners risk losing their *own* fluency in the language that serves as the all-important tie to their broader, cultural community. Nor does Dr. Cokely believe that conversations through an interpreter alleviate those harms because "the cognitive demands of the interpretation process" make those interactions different from and more stilted than "conversational interactions." J.A. 156, 163. For Dr. Cokely, speaking to a translator "is not the same thing as having a conversation or discussion in [ASL]." J.A. 156.

As professors and practitioners of psychiatry and psychology explained in an amici curiae brief, a lack "of meaningful social interaction" is a "hallmark experience of most deaf and hearing-impaired prisoners, particularly those who are denied access to videophones." Br. of Amici Curiae Professors at 6. The experience mimics the effects of traditional solitary confinement, which include long-lasting psychiatric and physical difficulties. These professors contend that access to videophone technology, which permits "social interaction and environmental stimulation" through conversations with other ASL-speakers can be essential in mitigating these harms. *Id.* Dr. Cokely opined that unless Heyer is allowed to make point-to-point calls, he is likely to experience social isolation and loss of language skills.

B.

1.

We next consider Heyer's background. Heyer was born deaf and considers himself a "big part" of the Deaf community. J.A. 228. Heyer's parents did not discover he was deaf until he was either three or four years old. Before he learned ASL, his primary method of communication involved his parents "gestur[ing] and act[ing] things out [and] shak[ing] their finger at [him], but there was no language." J.A. 225. Heyer first learned ASL when he was five years old. At trial, Heyer described the experience as revelatory: "I lit up. It was—I was able to understand other people and I felt like a part of the group . . . ." J.A. 226. Prior to his incarceration, Heyer's friends were also Deaf, and he "love[d] being around other deaf people . . . [b]ecause [he] can identify with them." J.A. 228. He was able "to communicate really easily" with them and "[t]here[] [was] just a simple understanding of one another." J.A. 228.

Currently, Heyer is civilly committed as a sexually dangerous person in Federal Correctional Institution (FCI) Butner pursuant to the Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act").[4] Since 2008, Heyer has been housed in the Maryland Unit, which only houses Adam Walsh Act detainees. Prior to his civil

[4] The Adam Walsh Act permits the indefinite civil detention of former federal prisoners who are proven by clear and convincing evidence to be "sexually dangerous." 18 U.S.C. § 4248(a), (d)–(e). "[S]exually dangerous person[s]" include those "who ha[ve] engaged . . . in sexually violent conduct or child molestation" and also have "a serious mental illness, abnormality, or disorder" that causes "serious difficulty in refraining from" reoffending. *Id.* § 4247(a)(5)–(6).

commitment, Heyer was incarcerated for violating the conditions of his supervised release on an earlier child pornography conviction.[5]

In prison and while civilly committed, Heyer's access to the Deaf community has dwindled. Heyer testified that he had a total of twenty Deaf friends he would like to call across New Jersey, New York, Tennessee, and Washington, D.C. Heyer was only able to name two such friends,[6] and it appears he has not contacted those two individuals since his incarceration and subsequent civil commitment. But if he had videophone access, Heyer testified that he could ask his "adopted mom" to retrieve his "school yearbook[s]" and "get information and network out through the deaf community." J.A. 236. Heyer also testified that, once released, he wants to return to the Deaf community: "we use the same language. . . . [I]f I'm in the deaf world, I can communicate with people." J.A. 237.

2.

Adam Walsh Act detainees in the Maryland Unit—Heyer included—have a number of ways to communicate with friends and loved ones. Heyer can write letters to friends and family and visit them in-person. He also has access to the prison TRULINCS system, which allows detainees to send emails. The record reveals that Heyer has sent letters and

[5] Heyer has previously been convicted of terrorist threats and kidnapping in an incident that involved the sexual assault of a ten-year-old boy. Heyer has also admitted to molesting more than forty children. J.A. 515.

[6] Heyer also named his brother George, who is not deaf, as a person with whom he would like to make point-to-point calls.

emails while detained in the Maryland Unit. He has also had visitors from Prisoner Visitation Services, but Heyer testified that they did not know ASL.

Heyer also has access to a TTY machine located in the Maryland Unit. Heyer makes TTY calls under the direct supervision of a BOP staff member who dials the call from a list of preapproved numbers, sits next to him as he makes that call, logs the call information, prints a call transcript, and locks the transcript in a safe. Cross-examination revealed that Heyer has used that device approximately sixty times.

Pursuant to a partial settlement in this case, BOP agreed to provide Heyer with access to VRS calls by installing a videophone in his unit and contracting with a provider of SecureVRS services. The SecureVRS system restricts calls to preapproved numbers and "allow[s] BOP staff to maintain call records[;] track, record, and monitor SecureVRS calls in real-time[;] and play them back." J.A. 1647. Calls can also be interrupted to prevent prohibited conduct. If Heyer engages in any criminal activity using the SecureVRS system, those calls can be referred for prosecution. Heyer's communication technology expert testified that this same system could be used for point-to-point calls. However, those calls are currently locally disabled at the Maryland Unit.

Other than in-person visitation and SecureVRS calls—which do not allow Heyer to call Deaf friends—Heyer's remaining forms of communication depend on his ability to read and write English. Dr. Cokely testified that Heyer's English skills are rated as "novice low" on the American Council on Teaching of Foreign Languages (ACTFL) scale,

meaning that "he can barely handle some narration." J.A. 140.[7] Therefore, Heyer's English is effective only "in highly contextualized[,] routinized situations [in] which you have content or context to help you overcome grammatical irregularities." J.A. 151. Dr. Cokely also testified that a separate expert who previously evaluated Heyer similarly concluded that his reading and writing skills mimic those of a seven-year-old.

Heyer testified at trial about his struggles to communicate in written English: it can take him one-to-two hours to write one page, and he does not feel able to express his full thoughts. He stated that he has trouble reading English and struggles with vocabulary in particular. He often requires the help of another inmate—who he has taught some sign language—when writing letters and emails. He sometimes writes "short notes, basic ideas" to others at FCI Butner, but testified that they are only sometimes understood. J.A. 230. Heyer's correctional counselor testified that he is capable of generally discerning Heyer's short, written requests for help. However, he also testified that Heyer's writing is often confusing and that "the sentences don't add up." J.A. 364.

Heyer explained that TRULINCS emails are a particular source of stress because he often makes "mistakes trying to get [his] message out." J.A. 232. Heyer sometimes seeks assistance from another inmate in advance to write out the text of an email, which he then

---

[7] Dr. Cokely testified that the ACTFL scale rates language skills at the following levels: "novice, intermediate, advanced, superior, [and] distinguished." J.A. 138. Each level is further refined as "low, mid, [or] high." *Id.* Thus, Dr. Cokely assessed Heyer's English skills as "novice low" and his ASL skills as "intermediate low to mid." J.A. 138, 140, 151. Dr. Cokely opined that "the vast majority of native speakers of a language operate at the intermediate level." J.A. 138.

types out when he has access to TRULINCS. Nor is TTY any better. Heyer testified that he must "hunt and peck" to express himself and does not always understand the responses he receives. J.A. 234–35.

3.

BOP does not allow Heyer to make point-to-point calls with other Deaf individuals. At trial, BOP's Chief of the Office of Security Technology, Todd Craig, testified that BOP would need to secure a waiver of DOJ's IT security protocols in order to provide point-to-point calls. BOP has secured waivers in the past, including to install a videophone and provide SecureVRS services to Heyer. Craig also explained that BOP's decision to deny the accommodation was based on a fear of security threats posed by "video[] coded language" and the risk that either Heyer or some other detainee through Heyer could send coded instructions to the outside world, including plans for escape or smuggling contraband into the Maryland Unit. J.A. 276. He also hypothesized that Heyer's access to point-to-point calls might give him leverage to exploit other detainees for favors or give other detainees a reason to exploit Heyer for access. J.A. 277–78.

Craig further testified that Heyer's unique designation as a sexually dangerous person presents public safety concerns, namely that he could use point-to-point calls to engage in acts of child exploitation or view child pornography. For instance, Heyer could expose himself to a child and that "visual depiction is immediate and [when] it's done, . . . whatever the information is, it's been permanently transmitted." J.A. 279. Andrew Mansukhani—the Warden at FCI Butner—testified that he was opposed to any "additional

access," because he considered sex offenders to be a particularly manipulative population. J.A. 315. Warden Mansukhani feared that BOP would be unable to control the conduct of the other call participant, which could lead to acts of child exploitation. *Id.* He also stated that providing point-to-point calls would burden BOP resources because they would need to be monitored like Heyer's TTY calls and because BOP currently lacks a contract to translate Heyer's point-to-point communications. And it was the opinion of BOP's Commitment Treatment Program administrator that if Heyer were to view child exploitation over a point-to-point call, it could be "a big setback for treatment purposes." J.A. 344.

By contrast, BOP generally makes telephone calls available to non-deaf inmates—including Adam Walsh Act detainees—although Warden Mansukhani testified that he made individualized assessments about which detainees in the Maryland Unit are given phone privileges. That access can also be taken away based on misconduct. Relevant to this appeal, BOP permits thousands of prisoners to make phone calls in sixty foreign languages, including prisoners who have committed acts of terrorism. Those calls are not contemporaneously translated. Instead, they are recorded and stored for later translation pursuant to a BOP contract with an outside company. Warden Mansukhani also testified that certain Adam Walsh Act detainees are denied access to the TRULINCS email system. However, Heyer has not been denied access to TTY or TRULINCS based either on the nature of his offenses or misuse of those privileges.

C.

We turn next to the procedural history. This lawsuit was filed in 2011, and this opinion will not try to set forth each twist and turn in the case. Heyer's suit originally alleged multiple constitutional and statutory violations. The district court dismissed two claims before discovery and the remaining claims following summary judgment. Heyer appealed to this Court, which reversed the district court's grant of summary judgment on each of his remaining claims but one. *See Heyer v. U.S. Bureau of Prisons* (*Heyer I*), 849 F.3d 202, 221 (4th Cir. 2017). Relevant to this appeal, this Court reversed the district court's grant of summary judgment on Heyer's claim that BOP's failure to provide him access to videophone technology violated his First Amendment rights. *Id.* at 212–19. On remand, the parties settled all but one of Heyer's surviving claims. Pursuant to that settlement agreement, BOP agreed to provide Heyer with multiple accommodations, including both in-person ASL interpreter services and VRS calls through the SecureVRS system.

The parties were unable to settle Heyer's claim that BOP's continued refusal to allow Heyer to make point-to-point calls violated his First Amendment rights. In November 2017, the parties litigated a two-day bench trial in the Eastern District of North Carolina. At the trial's conclusion, the district court took the case under advisement and eventually issued an order on February 12, 2019. In that order, the court ruled that Heyer had "failed to prove that the BOP's failure to install and provide Heyer the requested videophone equipment violates the First Amendment" and entered judgment in favor of BOP. J.A. 528. On March 12, 2019, Heyer filed a motion to alter or amend the judgment

pursuant to Federal Rule of Civil Procedure 59(e). Heyer's motion was denied by the district court on June 21, 2019. Heyer timely appealed both orders.

II.

A.

"We review a judgment following a bench trial under a mixed standard of review . . . ." *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005). The district court's legal conclusions are reviewed de novo, but the court's findings of fact are only reviewed for clear error. *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019). This is a deferential standard, and we do not disturb the district court's factual findings if they are "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

"But while clear error review is deferential, it is not toothless." *Butts*, 930 F.3d at 238 (citing *United States v. Wooden*, 693 F.3d 440, 452 (4th Cir. 2012)). Factual findings made by the district court are not "so sacrosanct as to evade review," and this Court may reverse those findings when definitely and firmly convinced they are mistaken after a review of the full record. *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 379 (4th Cir. 1995). This Court has identified four grounds for reversing factual findings: (1) they were derived under an incorrect legal standard, (2) they "are not supported by substantial evidence," (3) they were made while ignoring "substantial evidence" supporting the opposite conclusion, and (4) they are "contrary to the clear weight of the evidence." *Id.*

B.

On appeal, Heyer argues that the First Amendment requires access to point-to-point calls to communicate with other Deaf individuals. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

The Supreme Court has also recognized that it is no easy feat to run a prison, and this branch of government lacks expertise in navigating the complicated decisions involved in doing so. *Turner*, 482 U.S. at 84–85. Prison officials are owed deference, and prisoners' constitutional claims receive a lower level of scrutiny than they might outside of prison walls. *See Haze v. Harrison*, 961 F.3d 654, 658 (4th Cir. 2020); *accord Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989) (noting that the *Turner* test is "less restrictive" than usual constitutional standards). Thus, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Civil detainees like Heyer "are entitled to more considerate treatment and conditions of confinement than" a prisoner. *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). However, courts in this Circuit accord the same level of deference when applying the *Turner* framework to civil detainees. *See Matherly v. Andrews*, 859 F.3d 264, 281–82 (4th Cir. 2017). The *Turner* framework accordingly looks to the government's legitimate *nonpunitive* interests, rather than its penological interests. *Id.* at 282.

As a threshold question, the *Turner* test first asks whether BOP's decision impinges on Heyer's First Amendment rights. *See Heyer I*, 849 F.3d at 213. Defined at the broadest level of generality, Adam Walsh Act detainees have a First Amendment right to communicate with those outside of the Maryland Unit. *Id.* It appears undisputed at this stage that BOP's policy does impinge on Heyer's ability to communicate: BOP's total ban on point-to-point calls restricts Heyer's access to the outside world. *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (applying *Turner*'s four-factor test when prison regulation affected availability of in-person visits). The ban certainly *impinges* on his First Amendment rights.

The *Turner* test next asks whether that impingement is reasonable. The *Turner* Court announced a four-factor test to weigh the reasonableness of a regulation that restricts the constitutional rights of confined individuals like Heyer:

> (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an "absence of ready alternatives" to the regulation in question.

*Heyer I*, 849 F.3d at 214 (alterations in original) (quoting *Turner*, 482 U.S. at 89–90). *Turner* thus calls for an inherently fact-bound inquiry into Heyer's rights, BOP's ban, and the non-punitive interests the ban supports. *See Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002). Heyer bears the burden of establishing that BOP's ban on point-to-point calls is unreasonable, and "substantial deference" must be given to the judgments of BOP staff. *Overton*, 539 U.S. at 132. But "this deference is not limitless," and this Court will

not sustain policies that lack a reasonable connection between ends and means. *Haze*, 961 F.3d at 659.

III.

The district court concluded that all four *Turner* factors weigh against Heyer. On appeal, Heyer contends that the district court erred with respect to each factor. After a review of the full record, this Court concludes that the district court correctly found in favor of BOP as to Factor One. However, even if Factor One weighs in favor of BOP, courts must still analyze Factors Two through Four to determine the reasonableness of the policy. *Jehovah v. Clarke*, 798 F.3d 169, 178 (4th Cir. 2015). Because we conclude the district court clearly erred in finding that Factors Two through Four weigh against Heyer, we hold that BOP's ban on point-to-point technology violates Heyer's First Amendment rights.

A.

*Turner* Factor One asks whether there is a rational connection between BOP's ban on point-to-point calls and BOP's legitimate, non-punitive interests, or if that connection is instead "so remote as to render the policy arbitrary or irrational." 482 U.S. at 89–90. A logical connection, even in "the most general sense," will suffice. *Jehovah*, 798 F.3d at 178. Thus, Factor One first requires identifying BOP's asserted non-punitive interests and determining whether they are legitimate before assessing the strength of the connection between those interests and the ban.

In its post-trial order, the district court considered BOP's stated interests in guaranteeing safety at FCI Butner, protecting the public, rehabilitating Heyer, and defraying costs. And indeed, this Court has held that each of these interests is legitimate in the context of Adam Walsh Act detention. *Matherly*, 859 F.3d at 283–84. The district court also correctly held that BOP's ban bears a rational connection to these interests. As discussed above, BOP staff testified that point-to-point calls create a risk of sexual exploitation, a security concern within the prison, and a potential impediment to Heyer's own rehabilitation. BOP will also need to translate and monitor his calls, which likely involves some cost.

Although one may question the strength of the connection between BOP's nonpunitive interests and its ban on point-to-point calls, BOP has satisfied Factor One. To the extent BOP has identified risks posed by point-to-point calls, banning the practice certainly "prevents these [risks] from occurring, and thus the ban bears at least some connection to BOP's" nonpunitive interests. *Heyer I*, 849 F.3d at 215; *see also Jehovah*, 798 F.3d at 178 (finding ban on prison communion wine "in the most general sense" bears a rational connection to interest in "preventing alcohol misuse").

B.

1.

*Turner* Factor Two asks whether Heyer has "alternative means of exercising" his First Amendment rights. 482 U.S. at 90. A lack of alternatives does not end the reasonableness analysis but is "some evidence that the regulations [are] unreasonable."

*Overton*, 539 U.S. at 135. The district court's order framed Heyer's constitutional interest in general terms as a First Amendment "right to 'communicate with others beyond the prison walls.'" J.A. 521 (quoting *Heyer I*, 849 F.3d at 213). The court then concluded that "Heyer has numerous alternative means of effectively communicating with individuals (both deaf and non-deaf) outside of FCI-Butner." J.A. 525. On review, we conclude that the district court misapprehended the specific First Amendment interest Heyer seeks to vindicate, because—for purposes of the *Turner* analysis—it is properly framed as a right to communicate with the Deaf community.[8]

We are mindful of the Supreme Court's admonition that Heyer's right must be construed "sensibly and expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989). *Thornburgh*'s requirement was derived from the Court's holdings in *Turner* and *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). In *Turner*, the Court held that a restriction on mail between prisoners at different institutions left open alternative forms of communication because prisoners could continue to communicate with non-prisoners. 482 U.S. at 92. In *O'Lone*, the Court also found that a total ban on the Islamic Jumu'ah ceremony survived Factor Two because prisoners could continue to participate in other Islamic practices. 482 U.S. at 351–52. Following this logic, some sister circuits have construed asserted constitutional interests at a broad level of generality, leaving open the ability to easily find alternative ways of exercising the right. *See, e.g.*, *DeHart v. Horn*, 227 F.3d 47, 54 (3d

[8] Unlike the Court's factual findings, its legal conclusions about the scope of the right are reviewed de novo. *See Butts*, 930 F.3d at 238.

Cir. 2000) (en banc) (asking if prisoner retains "alternative means of exercising his Buddhist beliefs generally").

This Court has declined in the past to read the import of *Thornburgh* so expansively, nor will we do so here. In *Wall v. Wade*, this Court declined to extend *O'Lone*'s reasoning to a ban on fasting for Ramadan, finding it "unduly restrictive" when applied to "one of the five pillars of Islam," which is "integral to all practicing Muslims." 741 F.3d 492, 501 & n.14 (4th Cir. 2014). And some sister circuits have similarly chosen to analyze constitutional rights under *Turner* at a fairly specific level. *See, e.g.*, *Mauro v. Arpaio*, 188 F.3d 1054, 1061 (9th Cir. 1999) (examining "right to receive sexually explicit communications"); *Giano v. Senkowski*, 54 F.3d 1050, 1056 (2d Cir. 1995) (examining right to "reinforc[e] the emotional bond between loved ones and similar affective links"); *Smith v. Delo*, 995 F.2d 827, 831 (8th Cir. 1993) (examining alternatives means of exercising "the right to communicate with the media and outside religious figures").

Thus, although Heyer's rights must be defined "expansively" for purposes of considering his available alternatives, we do not read the word "sensibly" out of *Thornburgh*'s instructions. 490 U.S. at 417; *see also Shakur v. Selsky*, 391 F.3d 106, 114 (2d Cir. 2004) (explaining that this requirement is intended "to '*allow for flexibility in determining what qualifies as another means of expression.*'" (emphasis added) (quoting *Giano*, 54 F.3d at 1055)). Nor do we understand past precedent to compel the generalized definition of Heyer's right given by the district court. *Turner* instead requires a contextualized inquiry into the scope of the right. In this case, that context makes clear that the "sensible" focus is on Heyer's ability to communicate with the Deaf community.

This case is distinguishable from *Turner*, which banned essentially *all* communication between non-relative prisoners at different prisons based on security concerns. 482 U.S. at 81–82. In that case, it made no sense to consider alternative *means* of communicating with other prisoners, because the entire purpose of the ban was to prevent such communications. By contrast, BOP has not banned point-to-point calls based on its fear that the Deaf community itself is a security risk, and it is entirely sensible to define Heyer's right in terms of access to that community.[9] The record reveals that the Deaf community is the only group with whom Heyer believes he can most fluently and completely express himself. It is the group most central to his identity—a community that shares his language and culture—and a lack of access to that community could very well produce harms, including social isolation. Heyer's circumstances resemble those of the plaintiffs in *Wall*, 741 F.3d at 501 & n.14, given the centrality of the interest he is asserting.[10]

---

[9] We are careful to note that we are not describing an *associational* right, which the Supreme Court has described as "among the rights least compatible with incarceration." *See Overton*, 539 U.S. at 131. Heyer's First Amendment interest involves the right to communicate, not associate more generally.

[10] This Court previously defined Heyer's right as the right to communicate beyond the walls of FCI Butner and cited sister circuits examining the ability to communicate with friends and family. *Heyer I*, 849 F.3d at 213 (collecting cases). At the time, BOP had not given Heyer access to videophone technology in any form and there was a genuine dispute as to whether he could communicate with *any* outside individuals—Deaf or otherwise. *Id.* at 213–18. Therefore, it made sense to frame the right in more general terms. At trial, however, Heyer's First Amendment claim was predicated on the need for point-to-point calls to communicate with other members of the Deaf community.

However, we do not define Heyer's right as a right to videophone access, although such a definition may be appropriate in a future case.[11] Nor will we construe the right so broadly that it extends to his brother, a non-deaf individual with whom Heyer can already communicate through SecureVRS. This Court's sensible and expansive definition of Heyer's right leaves open the possibility that Heyer *does* have alternative ways to communicate with the Deaf community through the other means BOP has made available. *See, e.g.*, *Hanrahan v. Mohr*, 905 F.3d 947, 959 (6th Cir. 2018) (examining right to interact with the media, rather than right to in-person interviews with the media, and finding alternative means such as telephone calls existed). Point-to-point calls are merely one means of exercising Heyer's right to communicate with the Deaf community. Accordingly, the district court's findings must be affirmed unless it clearly erred in finding that Heyer possessed alternative means of communicating with the Deaf community.

2.

We next consider the district court's finding that Heyer had alternative means of communicating with other Deaf individuals, notwithstanding BOP's ban on point-to-point calls. Such alternatives "need not be ideal; they need only be available." *Overton*, 539 U.S. at 135. For instance, in *Overton*, visitation restrictions left open alternative means of

[11] Heyer argues that he has a freestanding First Amendment right to use a videophone that is distinct from the more general right to communicate beyond prison walls. On appeal from summary judgment, this Court framed this case in terms of the right to communicate. We decline to alter that framework at this stage and take no position on this alternative argument.

communication, because even illiterate prisoners had alternatives such as sending messages through other visitors or making phone calls. *Id.*

The district court examined Heyer's ability to communicate with both Deaf and non-deaf individuals and concluded that VRS is an available alternative. VRS, however, only permits calls to non-deaf individuals. The district court's conclusion that VRS is a suitable alternative was clearly erroneous, because it rests on an incorrect understanding of Heyer's First Amendment interest, which is an interest in communicating with the *Deaf* community. *See Jiminez*, 57 F.3d at 379. The district court also concluded that Heyer had alternative means of communicating with Deaf friends, because he could visit in-person, write letters, send e-mails, and make TTY calls. This finding was "contrary to the clear weight of the evidence considered in light of the entire record," and we overturn it as clearly erroneous. *Id.*

At the outset, this Court has previously held that "in-person visitation is of little help in emergencies or other situations where there is a need for immediate contact." *Heyer I*, 849 F.3d at 216. No evidence was adduced at trial to support an opposite conclusion. Visitation is thus not of "sufficient utility" to constitute an alternative to point-to-point calls. *See Overton*, 539 U.S. at 135. Accordingly, Heyer lacks any other means of communication with the Deaf community that does not involve written English. As we acknowledged in *Heyer I*, the viability of those alternatives accordingly turns on whether Heyer can *effectively* communicate in written English. *Heyer I*, 849 F.3d at 216.

The district court found that because "Heyer can read, write, and effectively communicate in English at the third-grade level," these alternatives satisfied *Turner*'s

second factor. J.A. 525–26. But the district court's conclusion rests, in part, on its conclusory dismissal of Dr. Cokely's testimony about Heyer's lack of competency in written English. The district court stated that it "[did] not credit the evidence [that Heyer can effectively communicate in written English] from Dr. Den[n]is Cokely . . . . The cross examination of Dr. Cokely revealed flaws in his methodology and opinions." J.A. 525–26. We are cognizant of our obligation to accord the greatest level of deference to the district court's credibility determinations. *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008). However, the district court's minimal citations in support of this conclusion compared to the full evidence in the record compel us to hold that the district court clearly erred. The district court did not explain this finding; it simply cited to a portion of Dr. Cokely's cross-examination in which the government questioned Dr. Cokely's opinions. In particular, the cited portion of Dr. Cokely's cross-examination concerns his decision to assess Heyer's English using a prepared, rather than a random, writing sample and his admission that he can understand some of Heyer's writing. For instance, Dr. Cokely admitted that certain simple sentences in Heyer's writing assessment were comprehensible and that at least one of Heyer's emails appears to have been understood by its recipient.[12]

---

[12] This portion of the cross-examination also reveals that Dr. Cokely's interview with Heyer lasted ninety minutes and that Dr. Cokely did not specifically state in his expert report that his assessment was prepared using the ACTFL measure. To the extent these minor errors should be given any weight, they cannot overcome the substantial evidence supporting Dr. Cokely's assessment.

Dr. Cokely explained on direct examination that he requested a specific writing sample—in this case, a personal history and daily routine—to ensure Heyer would write about subjects with which he is likely to be most fluent. A writing sample based on those subjects should accurately reflect Heyer's competency with written English, rather than a struggle to explain an unfamiliar subject. Heyer was required to sit in front of his attorney and an interpreter while preparing that sample to ensure he had no help.

Furthermore, Dr. Cokely's testimony makes clear that his general ability to understand certain, basic sentences in that assessment—for instance, "I don't have sister," or "I have one brother older than me," J.A. 170—does not undermine his overall assessment. As Dr. Cokely explained, these are likely sentences Heyer has rehearsed and written many times before—and the purpose of the ACTFL measure is to elicit sentences with which Heyer is familiar. But even for this familiar narrative, Heyer's sentences were oftentimes too ambiguous to be understood: for instance, "[s]ometime people become lazy never sign language." J.A. 149. Nor does the ability of Heyer's friend to understand the gist of an email—itself riddled with errors and written in simple sentences—amount to evidence of effective communication.[13]

Dr. Cokely's testimony on cross-examination is consistent with his conclusion that Heyer communicates at an extremely deficient level of English and is barely able to handle

[13] The text of that email cuts against the conclusion that Heyer can effectively communicate in written English. It reads: "How are you? What up ? You are okay ? Your son did talk to me.your son told me .you went to go to the camp .your grandchild went to around playing your house all the time . ok you have fun timefor your grandchild.your heart for love your grandchild and all family . also too me lvu you." J.A. 2016.

basic narration. That conclusion is further supported by Dr. Cokely's testimony that—on average—the Deaf community possesses similar competency in English. Finally, it is consistent with his testimony that a previous expert had independently determined Heyer spoke English at a roughly third-grade level. The district court therefore erred by entirely rejecting Dr. Cokely's opinion.

The district court also stated without explanation that it "d[id] not credit Heyer's testimony." J.A. 526. However, Heyer's own testimony that he struggles to express himself in English as well as understand responses received is entirely consistent with Dr. Cokely's opinion. His testimony is also supported by evidence that individuals who are born deaf face higher barriers to learning English than other foreign-language speakers as well as by Heyer's testimony that he grew up in a language-deprived environment prior to learning ASL. In rejecting the weight of this evidence, the district court cited to a portion of the testimony of his correctional counselor. But that citation includes the correctional counselor's statement that "[s]ome of the sentences [in Heyer's writing] are not complete or they don't make any sense." J.A. 354. On cross examination, the correctional counselor further testified that Heyer's "wording is totally different than a [staff request] that is like legible, I can read. . . . [T]he sentences don't add up, [don't] make any sense, even if he copied it from somebody." J.A. 364.

The district court also cited to a number of examples of Heyer's writing. We need not parse these in great detail (and indeed, many of the cited pages are sealed before this Court). Trial testimony revealed that recipients understood some of these writings. But testimony from Heyer and his correctional counselor also demonstrated that Heyer often

requires the assistance of another detainee when drafting these writings—which are often short and simple and which are read in a context that permits their meaning to be understood (for instance, basic, written requests to BOP staff). This is a far cry from establishing that Heyer is able to generally express himself in written English or understand the written English that he receives. The district court conflated Heyer's ability to produce contextualized, simple writings reflecting a survival level of English with a broader ability to effectively communicate. But these writings do not bear on the broader question of Heyer's ability to effectively communicate in written English absent the court's conclusory dismissal of Dr. Cokely's expert opinions and Heyer's testimony. The district court's conclusion that Heyer can communicate in written English is therefore clearly erroneous, because it "is contrary to the clear weight of the evidence considered in light of the entire record." *Jiminez*, 57 F.3d at 379.

Although not explicitly addressed by the district court, we also conclude that Heyer's ability to receive help from other detainees does not elevate alternatives such as email, TTY, or letters to an adequate level. Such a solution is transient and depends on Heyer's good fortune to be housed with an individual capable of learning some ASL. It therefore lacks "sufficient utility" to support the alternatives. *Overton*, 539 U.S. at 135. To the extent the district court's conclusion implicitly relied on the availability of inmate assistance, it was clearly erroneous to do so in this case.

We recognize that "alternatives need not be ideal," so long as they are available. *Id.* But Heyer's English skills are so far from ideal that they cannot support the district court's conclusion that emails, letters, and TTY are sufficient alternatives. *See id.* Heyer seeks

the ability to communicate with the Deaf community. Those conversations can take on high-stakes dimensions or turn complex—for instance, if Heyer wanted to debate or discuss Deaf culture or current events affecting the Deaf community. The ability to say, "hello, how are you," does not equate to the ability to effectively communicate with his community. Given the right Heyer seeks to vindicate, it was clearly erroneous to find he can effectively exercise that right in written English.[14]

C.

*Turner* Factor Three requires this Court to weigh "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 482 U.S. at 90. In this case, Factor Three asks whether providing Heyer access to point-to-point calls "will have a significant 'ripple effect' on fellow inmates or on prison staff." *Id.* When accommodating the right comes "at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," courts should defer to BOP's decision-making. *Id.* at 92. Factor Three therefore looks *inwards* to examine the overall effect of the accommodation on prison administration.

The district court concluded that Factor Three weighs against Heyer. In particular, the court found that providing point-to-point calls would have serious consequences within the prison based on (1) the need for BOP to secure a waiver to the DOJ's IT policies, (2)

---

[14] Because we conclude that Heyer cannot effectively communicate in English, we do not reach his argument that TTY is independently "an inadequate substitute for a videophone." Opening Br. at 40.

the risk that Heyer would abuse point-to-point calls, (3) the risk that Heyer would be pressured by another inmate for access to point-to-point calls, (4) the difficulty involved with real-time monitoring of conversations conducted entirely in ASL, and (5) the financial cost of additional safeguards. Ultimately, our review of the record convinces us that the district court "disregarded substantial evidence that would militate a conclusion contrary to that reached," *Jiminez*, 57 F.3d at 379, and clearly erred in reaching this conclusion.

*First.* The district court credited the testimony of Todd Craig that BOP would be forced to secure a waiver from DOJ to allow point-to-point calls at FCI Butner. However, the trial testimony makes clear that this waiver actually permits BOP to bypass the normal DOJ IT protocols. And BOP has already received a waiver for the physical hardware required to provide point-to-point calls as well as for TTY, VRS, and a third form of services known as Video Remote Interpreting.[15] Although Craig generally described the process as a "hurdle," there is no evidence the waiver process would create more than a de minimis effect on BOP. J.A. 298.

*Second.* The district court concluded that there was a risk that Heyer could abuse point-to-point video calls in a manner that would create internal security concerns. There is some record evidence to support the general conclusion that point-to-point calls could hypothetically create these risks. For instance, Craig testified at trial that the technology has the capability to connect to a smartphone outside of the prison, which could permit Heyer to receive "real-time" information aiding an escape. He could also hypothetically

[15] Video Remote Interpreting is not otherwise relevant to this appeal.

receive a coded instruction from the outside world to commit a disruptive act within the Maryland Unit or send a coded request to have contraband smuggled into the unit.

In its factual findings, the district court noted several safety features of SecureVRS that mitigate those concerns for VRS calls. The district court specifically identified the fact that the SecureVRS phone is "mounted to a wall in a hallway directly outside of Heyer's unit team office," thereby allowing BOP staff to supervise the call. J.A. 519. Those calls will only be allowed to reach preapproved numbers, and BOP can monitor those calls in real-time or record them for later review. The record also makes clear that these same features are available for point-to-point calls made on the SecureVRS platform. The *only* difference between these SecureVRS calls and point-to-point calls is that the latter directly connect the call participants, while the former are mediated by a translator. Although this unique feature gives rise to the risks identified above, it does not alter the existence of numerous safety mechanisms to prevent the misconduct from occurring. Heyer could make his point-to-point calls in a hallway under staff supervision (as BOP already requires for TTY calls), those calls could be restricted to numbers pre-approved by BOP, and those calls would be recorded and stored. As Heyer's communication technology expert testified, the system allows calls to be immediately disconnected in the event of misconduct. Finally, any criminal activity would be recorded and available for prosecution.[16]

---

[16] These features therefore also preserve BOP's distinct interest in Heyer's own rehabilitation, because he would be unable to use point-to-point calls to engage in sexual misconduct.

*Third*. The district court also credited BOP staff testimony that Heyer's unique access to point-to-point calls would create a leverage point between Heyer and other detainees that could lead to exploitation and violence. This theory assumes that videophone access creates a point of leverage for those detainees. But given the safeguards detailed above, BOP has not explained how Heyer's access to point-to-point calls could actually be used by other inmates in a way that provides any incentive for other inmates to exploit Heyer or vice-versa.

*Fourth*. The district court found that "to safeguard the public, the BOP would need to expend substantial resources to monitor ASL conversations in real-time." J.A. 527. At trial, Warden Mansukhani testified that directly monitoring point-to-point calls would create "a tremendous impact" on staff resources. J.A. 319. However, as described above, BOP staff already engage in the labor-intensive process of directly monitoring Heyer's TTY calls, and the evidence presented at trial demonstrates that point-to-point calls would be a more efficient use of staff resources. Heyer is given extended time to use the TTY device, but Craig testified that he would likely only be given the typical fifteen minutes-per-call for VRS or point-to-point calls. Additionally, the platform would automate the process of restricting Heyer's calls to preapproved numbers, recording the call, and storing Heyer's call history. TTY calls currently requires BOP staff to do so manually.

The district court also found that—notwithstanding any burdens imposed on BOP staff resources—point-to-point calls would significantly burden BOP financially because Heyer's point-to-point calls would have to be live-translated from ASL. The record provides no basis to conclude that BOP would need to live-translate Heyer's calls to

address its security concerns. *See Jiminez*, 57 F.3d at 379 (noting clear error exists when "the district court's conclusion is contrary to the clear weight of the evidence"). Indeed, trial testimony revealed that BOP inmates speak sixty foreign languages on the telephone and that BOP expends resources to translate those calls for thousands of inmates. These calls are not live-translated, despite some of those calls being made by international terrorists. BOP instead records those calls and then delivers the recordings to an outside contractor for translation. It takes BOP several days to receive the translations back from the contractor. Based on this record, Heyer would be the sole inmate in BOP custody whose calls would be live-translated.

*Fifth.* The district court's opinion also overlooks substantial evidence that any costs imposed on BOP staff resources or finances would be de minimis. The evidence established at trial demonstrates that the SecureVRS hardware has already been installed and that this hardware supports point-to-point calls. It is true that BOP will likely incur some cost in procuring post-hoc translation of Heyer's calls. The Eighth Circuit appears to reject requested accommodations unless they are cost-free, *Yang v. Mo. Dep't of Corr.*, 833 F.3d 890, 895 (8th Cir. 2016), but this Circuit has not been so restrictive, *see Heyer I*, 849 F.3d at 217 n.10 (suggesting a $2500 expense would be de minimis); *accord Beerheide*, 286 F.3d at 1191 ($13,000 expense is de minimis in light of overall food budget). The exact dollar value of this additional translation is unknown, but BOP already contracts for in-person ASL interpreters as well as the translation of foreign language calls. BOP did not attempt to determine whether those same contractors could translate Heyer's calls or how much it would cost to do so. *See Kikumura v. Turner*, 28 F.3d 592, 599 (7th

Cir. 1994) ("[A] prison may not restrict a prisoner's rights without even looking to see how the rights might be accommodated and estimating the expense entailed by doing so."). Regardless, the increased marginal cost of translation created by one more inmate is clearly de minimis compared to the robust translation and interpretation contracts already in place.

A review of the full record fully convinces us that the district court's conclusions are erroneous. The district court's analysis ultimately turns on the premise that—because they allow unmediated contact between ASL speakers—point-to-point calls are uniquely capable of giving rise to the concerns identified by the court. However, the district court's focus on the hypothetical risks of point-to-point calls overlooks substantial evidence that BOP already utilizes resource-efficient means of mitigating the risks associated with these calls. Point-to-point calls therefore would not produce the "significant 'ripple effect'" warned of by the *Turner* Court. 482 U.S. at 90.

D.

Finally, *Turner* Factor Four asks Heyer to identify a "ready alternative[]" to a total ban on point-to-point calls "that fully accommodates [his] rights at *de minimis* cost to" BOP's nonpunitive interests. 482 U.S. at 90–91.[17] Heyer contends that BOP could provide point-to-point calls with the additional safeguards it provides for other forms of communication. The district court rejected this contention, concluding that BOP staff

[17] Unlike Factor Three—which considers the impact of the accommodation on prison administration—Factor Four looks to its effect on BOP's broader interests such as public safety and Heyer's own rehabilitation.

would have to monitor each of his calls and fund live-translation, which would impose greater than de minimis financial costs. The court also credited trial testimony that this accommodation would pose a greater than de minimis threat to public safety. Because point-to-point calls directly connect the participants, there is a risk that Heyer could expose himself to a child, receive images of child pornography, or watch another caller exploit a child for his benefit. The court also credited the testimony of Warden Mansukhani that these risks are heightened in the Maryland Unit—which houses sexually dangerous persons with a history of manipulative behavior—as well as by Heyer's own history of sexual misconduct. However, the district court does not explain why already available safeguards do not mitigate these risks to a de minimis level. The court conflated the nature of the risks posed by videophones with the likelihood those risks will be realized, ignoring substantial evidence weighing in Heyer's favor as to this Factor. *See Jiminez*, 57 F.3d at 379.

*First*. As Heyer argues, providing point-to-point calls through the SecureVRS system with the same protocols associated with TTY calls would greatly reduce the risk that those calls will result either in child exploitation or disruptive behavior within the prison. BOP has presented no testimony explaining how Heyer would successfully expose himself in a prison hallway while under the watchful eye of BOP staff. It is true that BOP staff could not restrain the *other* call participant, but trial testimony established that the SecureVRS system can instantly sever the connection in the event of misconduct. BOP will also have a recording of the call that it can refer to prosecutors if any criminal activity occurs. At trial, Craig testified that these same safeguards were sufficient to mitigate risks associated with TTY and VRS.

*Second*. The testimony clearly established that treating Heyer's point-to-point calls like foreign language calls will protect against other risks associated with coded messages. As explained above, BOP already records and then translates calls made by thousands of inmates in sixty foreign languages.

*Third*. A review of the full record establishes that these additional safeguards will impose only a de minimis burden on BOP's resources. The district court's analysis of these burdens is limited to the cost of having staff members monitor Heyer's calls and the cost of live-translation. In particular, the district court cited *Matherly*, 859 F.3d at 283, for the proposition that the need for staff supervision creates a burden on BOP's resources. However, the proposed alternative in *Matherly* would have required an entirely new policy of supervising every Adam Walsh Act detainee while they open their mail. *Id.* By contrast, BOP already supervises Heyer's TTY calls. Finally, as discussed above, there is no evidence in the record suggesting a need for live-translation. BOP's total ban on point-to-point calls is an "exaggerated response" to perceived threats to its interests. *Turner*, 482 U.S. at 87.

## IV.

We recognize our circumscribed role when reviewing the district court's judgment following a bench trial, especially considering the deference given by this branch to the judgment of prison officials. But we may not abdicate that role in the face of clear error. Heyer's constitutional rights are not defined merely by his status as a civil detainee or his past conduct. They are also defined by his status as a Deaf individual cut off from his

community in a manner more complete than even foreign language prisoners. The evidence at trial established that Heyer lacks any ability to communicate with the Deaf community. And the district court clearly erred by crediting BOP testimony about the risks of point-to-point calls without considering the wealth of testimony about safety features that have managed those risks for every other form of communication it makes available. Although we are hesitant to disturb the district court's considered findings, we must do so here. We reverse the district court's post-trial judgment and remand for entry of judgment in favor of Heyer as well as any necessary proceedings to determine an appropriate remedy.

*REVERSED AND REMANDED*